B199— Summons without notice, Supreme Court,
personal or substituted service. 12 pt. type, 4-94

© 1993 JULIUS BLUMBERG, INC.,
PUBLISHER, NYC 10013

# Supreme Court of the State of New York

## County of    New York

THOMAS H. LEE EQUITY FUND V, L.P.,
THOMAS H. LEE PARALLEL FUND V, L.P. AND
THOMAS H. LEE EQUITY (Cayman)FUND V, L.P.

*Plaintiff(s)*

against

GRANT THORNTON LLP

*Defendant(s)*

FILED
NEW YORK
COUNTY CLERK'S OFFICE
AUG 16 2007

Index No.
Date purchased

Plaintiff(s) designate(s)
NEW YORK
County as the place of trial.

The basis of the venue is
N.Y. C.P.L.R. §503

## Summons

Plaintiff(s) reside(s) at

County of    07602774

To the above named Defendant(s)

**You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20   days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated,    8/16/07

Greg D

Attorney(s) for Plaintiff

Office and Post Office Address
Greg Danilow
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153
(212) 310-8000

Defendant's address:

Grant Thornton LLP
666 Third Avenue
New York, NY  10017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

THOMAS H. LEE EQUITY FUND V, L.P.,
THOMAS H. LEE PARALLEL FUND V, L.P. and
THOMAS H. LEE EQUITY (CAYMAN) FUND V, L.P.

                  Plaintiffs,

       - against -

GRANT THORNTON LLP,

            Defendant.

------------------------------------------------------------------

Index No. 602774/07

**COMPLAINT**

*FILED*
*AUG 16 2007*
*COUNTY CLERK'S OFFICE*
*NEW YORK*

        Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V,

L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, the "THL Funds" or

"Plaintiffs"), by and through their undersigned counsel, for their complaint against Grant

Thornton LLP ("Grant Thornton" or "Defendant"), allege on information and belief, except as to

those allegations describing their own actions, as follows:

### INTRODUCTION

        1.      This is an action for aiding and abetting fraud, misrepresentation and

professional malpractice brought by the THL Funds against Grant Thornton, in its capacity as the

former, purportedly independent auditor of Refco Inc. and certain of its predecessors,

subsidiaries and affiliates (collectively, unless reference is made to a specific entity, "Refco" or

the "Company"). The claims set forth herein are the result of Grant Thornton's material

misrepresentations and omissions to the THL Funds regarding, among other things, the absence

of certain related-party transactions, substantial bad debts and other significant risks of fraud at

Refco, as well as the completeness and accuracy of Refco's historical financial statements.

Grant Thornton's improper conduct discussed herein induced the THL Funds to invest more than

$450 million in Refco Group Ltd., LLC ("Refco Group"), the predecessor of the public company, in August 2004 (the "August 2004 Acquisition").

       2.      In June 2004, the THL Funds agreed to invest approximately $452 million in Refco, then one of the nation's leading independent providers of execution and clearing services for exchange traded derivatives. The investment was consummated approximately two months later, in August 2004. The THL Funds made this investment only after the completion of an extensive due diligence process, undertaken with the help of the THL Funds' affiliates and numerous professional advisors over the course of more than ten months. As an integral part of these efforts, the THL Funds engaged KPMG LLP ("KPMG") to conduct accounting due diligence (including by meeting with Grant Thornton and obtaining, reading, commenting on and making inquiries regarding Refco's audited financial statements for the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004) and assist the THL Funds in assessing the risks of the proposed investment. Based in large part on the information provided by Grant Thornton, the THL Funds, through the work of KPMG and their other advisors, obtained sufficient comfort regarding Refco's financial condition and risk profile that they determined to proceed with the investment.

       3.      But despite the duty it had assumed to the THL Funds via its knowing provision of financial information and risk assessments central to the THL Funds' investment decision, as well as its professional obligations to Refco, Grant Thornton knowingly and/or with gross negligence failed to alert the THL Funds to the existence of: (i) significant historical related-party transactions; (ii) suspicious, recurring "reverse repurchase" (or "reverse repo") transactions with third-parties that straddled the close of Refco's reporting periods and that did not appear to serve any legitimate business purpose; or (iii) its long-standing concerns regarding

the potential for fraud at Refco, including a weak internal controls. These material and knowing

omissions, much like the clean and unqualified audit opinions Grant Thornton issued with

respect to Refco's fiscal 2003 and 2004 financial statements, kept hidden the fraudulent scheme

then being perpetrated by Phillip Bennett ("Bennett"), Refco's former Chairman, President and

Chief Executive Officer, and various others to hide worthless receivables and misrepresent

Refco's true financial condition – which fraud ultimately led to the THL Funds losing hundred of

millions of dollars. Indeed, the August 2004 Acquisition would not have occurred but for Grant

Thornton's misrepresentations and omissions in its discussions with the THL Funds and their

advisors.

4.      These misrepresentations and omissions continued even after the closing

of the August 2004 Acquisition, when Grant Thornton assisted Refco in complying with an

express condition of the Equity Purchase and Merger Agreement (the "Purchase Agreement")

requiring Securities and Exchange Commission ("SEC") Regulation S-X compliant audited

financial statements for fiscal years 2002 through 2004. Because Refco did not have Regulation

S-X compliant audited financial statements for the fiscal year ended February 28, 2002, Grant

Thornton – aware of the Purchase Agreement condition and in an effort to facilitate and induce

the THL Funds' investment – undertook a re-audit of those financial statements. Grant Thornton

ultimately completed this re-audit in or around October 2004, which, like its predecessor audits,

again resulted in its issuance of an unqualified audit report on financial statements that failed to

disclose the extent and nature of the Company's significant related-party transactions.

5.      Grant Thornton's misrepresentations and omissions, discussed in detail

herein, render Grant Thornton liable to the THL Funds. As Refco's independent auditor, Grant

Thornton was tasked – both specifically with respect to its Refco engagement and more generally

with respect to its obligations as an auditing professional – with examining and attesting to the accuracy and completeness of the Company's financial statements and disclosures. To that end, Grant Thornton, as compared to the THL Funds, was in the unique position of having years of knowledge and experience with Refco, as well as unfettered access to Company information, and subject to the exceedingly stringent professional obligations attendant to the conduct of an audit. Had Grant Thornton performed its audits in accordance with governing professional standards, it undoubtedly would have uncovered Bennett's fraudulent scheme. Grant Thornton, however, did no such thing.

6. Grant Thornton's failure to uncover and/or disclose the ongoing fraud, or at least alert the THL Funds to its possibility, is even more egregious in light of the specific concerns raised by the Grant Thornton engagement partner on the audit, Mark Ramler ("Ramler"), who had been involved in the audits of Refco's financial statements in various capacities for over twenty years (more than a decade as the audit engagement partner). Ramler's (and, therefore, Grant Thornton's) extensive knowledge of and familiarity with Refco and its senior management caused him to categorize the Company (during his tenure with both Arthur Andersen LLP ("AA"), Refco's predecessor auditor through the fiscal 2002 audit, and Grant Thornton) as a "high-risk" client. Ramler believed – but never disclosed to the THL Funds or their advisors – that Refco:

(a) engaged in significant related-party transactions that constituted substantial obligations to the Company and required appropriate accounting and disclosure;

(b) lacked adequate internal controls;

(c) engaged in loan transactions with various third-parties, including Liberty Corner Capital Strategies, LLC ("Liberty Corner") and Delta Flyer, Inc. ("Delta Flyer"), that straddled the close of the Company's fiscal years 2003 and 2004, appeared to have no business purpose, and were not

typical "reverse repurchases" or "time deposits," despite being recorded as such, because there was no collateral securing them; and

(d)     was engaging in such transactions with Liberty Corner and Delta Flyer, among other third-parties, in an effort to "clean up" related-party receivables at the Company's fiscal year-ends.

7.      In addition, Ramler explicitly acknowledged – in Grant Thornton internal memoranda – that there was a further risk of fraud at Refco in light of the Company's impending initial public offering and the resulting benefit of overstating earnings in an effort to present the most favorable financial picture possible. Yet, Grant Thornton, at a bare minimum, failed to perform an effective audit, implement additional procedures to resolve Ramler's and the firm's concerns, or bring about the disclosure of the questionable transactions in the footnotes to Refco's consolidated financial statements, as was its obligation.

8.      Even more remarkably, however, despite Grant Thornton's knowledge and significant concerns regarding Refco – and despite the fact that Grant Thornton was, at all relevant times, keenly aware that the THL Funds were contemplating a substantial investment in Refco and had specifically engaged KPMG, among others, to conduct due diligence of the Company's finances and accounting and to assess the risks of the investment – Grant Thornton failed to apprise the THL Funds or their advisors that certain transactions (including the related- and third-party transactions referenced above) were particularly suspicious or might require further investigation. Instead, Grant Thornton withheld this information from the THL Funds and their advisors and simply continued to endorse its clean and unqualified audit opinions on financial statements that painted a misleading portrait of the Company's financial position.

9.      Unbeknownst to the THL Funds or their affiliates and advisors, and undisclosed in the financial statements audited by Grant Thornton and relied upon by the THL Funds in connection with the August 2004 Acquisition, Bennett and his co-conspirators had

years earlier embarked on a scheme designed to misrepresent Refco's true financial picture by falsifying its books and records. The fraud was designed to mask – through a series of sham loan transactions – a group of largely worthless receivables, bad debts and questionable obligations. Grant Thornton's conscious disregard of the component transactions through which the fraud was accomplished, or grossly negligent failure to implement adequate audit procedures for detecting and identifying the Company's improper accounting and inadequate disclosure of such transactions, enabled the fraud to continue.

10.    In early October 2005, Refco's Board of Directors, which included designees of the THL Funds, learned for the first time of the fraudulent activities by Bennett and his co-conspirators. On October 10, 2005, Refco, at the direction of its Board of Directors, issued a press release disclosing the discovery of an approximately $430 million receivable owed to Refco by RGHI. The Audit Committee of the Board of Directors immediately commenced an internal investigation of the facts and circumstances surrounding Bennett's actions, retaining independent counsel and a forensic accounting firm to explore the true extent of the fraudulent scheme. The Company requested that Mr. Bennett take a leave of absence and further contacted the SEC, the Commodities Futures Trading Commission (the "CFTC") and other regulatory bodies to report the wrongdoing. The United States Attorney's Office for the Southern District of New York (the "USAO") arrested Bennett shortly thereafter for his role in the fraudulent scheme. Refco's stock price plummeted, losing over $1 billion in market capitalization. Within a week of Refco's press release, it commenced a bankruptcy case under Chapter 11 of title 11 of the United States Code, and the interests acquired by the THL Funds from RGHI in the August 2004 Acquisition became worthless.

11.    In this action, the THL Funds seek to recover from Grant Thornton the financial loss that they and their affiliates suffered, which loss could have been averted had it not been for Grant Thornton's knowing and/or grossly negligent misrepresentations and omissions to the THL Funds and their advisors regarding the accuracy and completeness of the Company's financial statements. The THL Funds seek to hold Grant Thornton liable for the significant damage caused to them and their affiliates as a result of the actionable conduct described herein.

## JURISDICTION AND VENUE

12.    Jurisdiction is proper pursuant to CPLR §§ 301 and 302. Defendant possesses sufficient minimum contacts with the state of New York to render the exercise of jurisdiction by a New York court permissible under traditional notions of fair play and substantial justice. Although Defendant's principal place of business is in Illinois, Defendant maintains a presence and transacts business, including with respect to the auditing work, meetings and communications at issue in this action, in the state of New York.

13.    Venue is proper in this County under CPLR § 503, as none of the parties maintain their principal office in the state of New York.

## PARTIES

14.    Plaintiff Thomas H. Lee Equity Fund V, L.P. is a Delaware limited partnership.

15.    Plaintiff Thomas H. Lee Parallel Fund V, L.P. is a Delaware limited partnership.

16.    Plaintiff Thomas H. Lee Equity (Cayman) Fund V, L.P. is a Cayman Islands limited partnership.

17.    Defendant Grant Thornton, headquartered in Chicago, Illinois, is the United States member firm of Grant Thornton International and the fifth largest United States accounting firm. Grant Thornton served as Refco's outside auditor at all relevant times since March 2003, when it succeeded AA in that capacity. Grant Thornton provided auditing and accounting services to Refco prior to and in connection with the August 2004 Acquisition, including the issuance of clean and unqualified audit opinions on Refco's consolidated financial statements for the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004.

## FACTUAL BACKGROUND

18.    Until the revelation of the fraud perpetrated by Bennett and his co-conspirators, Refco had been a leading provider of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets. However, Grant Thornton's failure to adhere to the professional standards required of it, as well as Grant Thornton's failure to inform the THL Funds of its significant concerns regarding Refco, allowed Bennett's scheme to continue undiscovered. Wholly unaware of the fraud, and in reliance on the financial statements audited by Grant Thornton and Grant Thornton's direct representations and withholding of material facts relating thereto, the THL Funds, to their detriment, invested more than $450 million in the Company in August 2004.

### The Fraudulent Scheme Of Bennett And His Co-Conspirators

19.    According to the latest superseding indictment issued by a grand jury sitting in the United States District Court for the Southern District of New York (the "Indictment"), starting in the late 1990s, Bennett and certain other former Refco officers and shareholders schemed to hide the true financial health of Refco from investors, lenders,

regulators and the public. Bennett and his co-conspirators did so in order to sell the Company, in whole or in part, for their own benefit. As detailed therein, their conduct included orchestrating a series of sham loan transactions (which have come to be referred to as the "round-trip loans"), designed to hide customer and proprietary trading losses and otherwise mask Refco's true financial condition. These transactions rendered Refco's financial statements for the relevant periods materially false and misleading.

20.    According to the Indictment, in the 1990s Refco directly and indirectly incurred a series of substantial trading losses. In addition to proprietary trading losses, certain Refco customers to which Refco had extended credit incurred hundreds of millions of dollars of losses in their Refco accounts. These losses collectively were material to Refco's reported results of operations. Accordingly, when the customers could not repay the loans that Refco had extended, rather than disclosing these proprietary and customer trading losses, and writing them off as required, Bennett embarked on a fraudulent scheme to hide them and thereby mask Refco's true financial condition.

21.    The first step in the fraudulent scheme involved removing these uncollectible receivables from Refco's books by transferring them to RGHI – which was not consolidated with the other Refco entities – thereby creating a large receivable that RGHI owed to Refco and that at times totaled more than $1 billion (the "RGHI Receivable"). This receivable was composed of debit balances in three Refco accounts: RGHI's accounts at Refco Capital Markets, Ltd. ("RCM") and at Refco Capital Corporation (later, Refco Capital LLC) ("RCC"), and the RCM account of Refco Global Finance ("RGF").

22.    The first sham transactions orchestrated by Bennett occurred in 1998 and 1999 and entailed a series of loans from unaffiliated third parties to RGHI in late February of

each year immediately before the end of Refco's fiscal year, with the loans being repaid shortly after the close of the period. Bennett and his co-conspirators also caused Refco to engage in undocumented yearly transactions from February 2000 through February 2005 with an Austrian bank, BAWAG P.S.K. Bank für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG"), the former 10% owner of Refco, that were used to pay down the RGHI Receivable at the end of Refco's fiscal year.

23.    In February 2000, Bennett also began to orchestrate a series of round-trip loan transactions with unrelated entities to hide the RGHI Receivable. Ultimately, Refco engaged in 17 sham round-trip loan transactions over a period of more than four years – not a single one of which was accurately identified and reported by Grant Thornton to the THL Funds or their advisors. Each of these 17 sham round-trip loan transactions followed a similar pattern. A Refco entity, generally RCM, would make a loan to an unaffiliated customer. Simultaneously, the customer would make a loan in the same amount to RGHI, which funds RGHI would use to pay down its obligation to Refco. Refco Group unconditionally and absolutely guaranteed the prompt and complete performance of all of RGHI's obligations and liabilities under the loan agreement, including repayment. As a result of these "loans," Refco's financial statements did not reflect related-party transactions from RGHI, but instead reflected receivables in those amounts from third-parties unaffiliated with Refco, Bennett or RGHI. In addition, Refco's financial statements never revealed the existence of the related-party guarantee by Refco of RGHI's obligations.

24.    To enable the customers to profit from this arrangement, the interest rate that RGHI paid the customers for their "loans" was between 15 and 100 basis points higher than the interest rate that the customers paid Refco on the Refco "loans." The net profit made by the

customers on each transaction ranged from $1,500 to almost $200,000, depending on the amount loaned, the interest spread and the duration of the transaction. Although characterized as loans, generally no funds were actually transferred other than the customer's profit from the interest spread.

25.    A few days after the end of each Refco financial reporting period, the transactions were unwound. Refco would lend the money back to RGHI (thus increasing the amount owed by RGHI to Refco), which RGHI then used to pay back the unrelated customer the full amount of the loan.

26.    Not only were these loans unwound within days of the end of Refco's financial reporting period, but in each instance, the third-party customer was insulated from any economic risk, given Refco Group's unconditional and absolute guarantee of all of RGHI's obligations and liabilities to the customer under the loan documents, including the obligation to pay principal and interest. In addition, Refco Group agreed to defend, indemnify and hold harmless the third-party customer from and against, among other things, any claims, losses or liabilities imposed upon or suffered by the customer as a result of any claim of a third-party arising out of or based on the loan transactions. Bennett stood on both sides of each transaction: on behalf of RGHI, he signed the documentation for each loan to RGHI, and on behalf of Refco Group, with one exception, he also signed the guarantees and indemnities. The corresponding RCM loans to the customer were generally executed by Santo Maggio, the former President and CEO of Refco Securities, LLC ("RSL") and the former President of RCM, although Bennett executed one, and several were executed by another Refco executive.

27.    These round-trip loans were essentially sham transactions with absolutely no risk to the third-party. They thus lacked economic substance and were undertaken by Bennett

and his co-conspirators solely in furtherance of an illegal scheme to defraud investors, financial institutions, regulators and the public so that they could eventually reap millions of dollars from the sale of all or part of Refco. As detailed in the Indictment, Bennett caused the reduction of the RGHI Receivable in this manner at every fiscal year-end from at least February 28, 1998 and at every fiscal quarter-end from May 2004 through August 2005. At the end of each annual reporting period, first AA and later Grant Thornton audited Refco's books and issued clean and unqualified audit opinions on financial statements that did not disclose the round-trip loans or the full extent of the RGHI Receivable.

28.    As a result, the Refco financial statements, audited by AA and then Grant Thornton, were materially false and misleading and did not fully and fairly, accurately, completely or truthfully represent the Company's financial condition. The round-trip loans and the RGHI Receivable were related-party transactions and material contracts and, because of the Refco guarantees, obligations of Refco, both of which were required to be disclosed (including to the THL Funds and their advisors in connection with the August 2004 Acquisition), but were not. As discussed at length below, sufficient information was available to Grant Thornton as to the means by which the fraud was perpetrated, which Grant Thornton willfully ignored and/or was grossly negligent in failing to discover and disclose.

**Grant Thornton's Refco Engagement**

29.    Beginning in the late 1980s and continuing through the audit of Refco's consolidated financial statements for the fiscal year ended February 28, 2002, AA served as the Company's independent auditor. During the final ten years of AA's tenure, Ramler served as the engagement partner on the Refco audit team (after serving in more junior capacities since the 1980s), with various other individuals performing the roles of audit manager, audit senior and staff auditors. When AA ceased functioning as an auditing firm in mid-2002, Ramler joined the

New York office of Grant Thornton as a partner. Later that year, Ramler proposed Refco to Grant Thornton as a prospective client. Grant Thornton accepted the engagement in March 2003 with Ramler continuing to serve as the engagement partner.

30.    Based on his lengthy tenure overseeing the Refco audits, Ramler was knowledgeable regarding Refco's business and the relationships between its various entities. Ramler believed he had such a close relationship with the Company that management would not have engaged in any transactions without first seeking his thoughts and advice. Ramler further acknowledged that Bennett and other members of Refco's senior management called him on an almost daily basis to discuss transactions and business issues.

31.    This extensive and intimate knowledge led Ramler, while at both AA and Grant Thornton, to categorize Refco as a "high-risk client," in part because it engaged in significant and complex related-party transactions. As Ramler explained in an April 11, 2005 memorandum to the Grant Thornton files: "[T]he risk of fraud has to be seriously considered with the LBO and the potential IPO. The IPO price will be based on a multiple of proforma earnings so there is a considerable gain to shareholders in overstating earnings in presenting the most favorable financial picture." Ramler, however, never once informed the THL Funds or their advisors – including KPMG, which (as Grant Thornton was aware) had been retained specifically to assess the risks of the THL Funds' proposed investment – of any of these concerns.

32.    Grant Thornton conducted financial statement audits for Refco's fiscal years ended February 28, 2003, February 29, 2004 and February 28, 2005. At first, Grant Thornton's audits included Refco and the stand-alone financial statements of its subsidiaries

RCC and RCM.[1]  Grant Thornton never conducted audits of RGF, a third Refco subsidiary

involved in Bennett's financial statement manipulations, and no longer separately audited RCC

when it conducted its financial statement audit for the fiscal year ended February 28, 2005.

33.    Grant Thornton was paid a total of $9,279,568 in professional fees for the

financial statement audit and review services it provided to Refco during the years 2003 through

2005.

**Grant Thornton's Integral Role In The August 2004 Acquisition**

34.    In October 2003, Credit Suisse First Boston LLC ("CSFB") issued a

Confidential Information Memorandum in connection with the potential sale of Refco.  CSFB

characterized Refco as "a unique financial services firm and the largest derivatives clearing firm

in the world."

35.    Following a period of negotiations, on November 4, 2003, Thomas H. Lee

Partners, L.P. ("THL Partners"), an affiliate of the THL Funds, executed a confidentiality

agreement for "consideration of the possible acquisition" of Refco, and on November 23, 2003,

THL Partners, on behalf of the THL Funds, submitted an initial bid for the Company.  On

February 6, 2004, after multiple meetings with Refco management and CSFB, THL Partners

submitted a revised bid for the Company and was invited to commence due diligence for a

potential acquisition.

36.    Because Refco's financial statements and risk profile were integral to the

THL Funds' investment decision, the THL Funds retained KPMG, among others, to assist in

their diligence efforts.[2]  As Grant Thornton was keenly aware, KPMG was specifically tasked by

---

[1] Another accounting firm, Goldstein Golub Kessler, LLP, audited RSL.

[2] The THL Funds also engaged Weil, Gotshal & Manges LLP to perform legal and regulatory due diligence, and McKinsey & Company to conduct customer surveys across Refco's business lines and to analyze and forecast

the THL Funds to conduct a detailed assessment of the Company's financial reporting for the

fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004, and the risks of

the proposed investment. As part of their duties, KPMG principally: (a) analyzed Refco's

quality of earnings, including non-recurring and normalizing items; (b) determined whether there

were any unusual and aggressive applications of accounting policies; and (c) assessed the quality

of the Company's assets, including the credit risk attendant to Refco's customer receivables, and

the completeness of its reported liabilities.

   37.  In the course of the diligence process, the THL Funds and their advisors,

including KPMG, were provided with, among other things, audited financial statements for

Refco for the periods set forth above – with respect to which both AA (for 2002) and Grant

Thornton (for 2003-04) issued clean and unqualified audit opinions. These financial statements,

which Grant Thornton knew were of the utmost importance to the THL Funds' investment

decision, purported to present fairly in all material respects the consolidated financial position

and operating results of the Company, and (as discussed below (see infra, ¶¶ 71-79)) were

represented by Grant Thornton, among others, to be complete, correct and accurate reflections of

Refco's financial position, including as to the value and nature of all receivables and the proper

treatment of all related-party transactions.

   38.  KPMG also reviewed certain audit work papers that Grant Thornton

prepared in connection with its audits of Refco's consolidated financial statements for the fiscal

years ended February 28, 2003 and February 29, 2004. The materials provided to KPMG by

Grant Thornton included the following:

---

industry growth. Sandler O'Neill & Partners, a well-known investment firm specializing in financial services companies, analyzed Refco's position within the market, Marsh & McLennan assessed risk management and the adequacy of insurance, and Mercer Human Resource Consulting reviewed human resource issues.

(a)    Refco Group consolidation schedules as of February 28, 2003 and February 29, 2004;

(b)    audited financial statements as of February 28, 2003 and February 29, 2004 for certain Refco subsidiaries;

(c)    audit confirmations for, among other things, cash and bank balances, margin balances and receivable balances at fiscal year-end; and

(d)    other work papers relating to Refco's year-end regulatory filings with the SEC and CFTC.

39.    Following the completion of the THL Funds' due diligence efforts, on August 5, 2004, the August 2004 Acquisition closed and the THL Funds acquired from RGHI roughly a majority of the equity interests in Refco for approximately $452 million in cash. During the course of the transaction, and at the time of the closing, the THL Funds were not aware of, and could not with reasonable diligence have learned of, the fraudulent scheme. The THL Funds relied to their detriment on the accuracy and integrity of the representations and other information provided directly to them and their advisors by Grant Thornton in deciding whether to proceed with the August 2004 Acquisition. Had truthful and complete information been provided by Grant Thornton, or had Grant Thornton, at the very least, alerted the THL Funds or their advisors to what it knew to be suspicious, recurring transactions straddling the close of Refco's reporting periods (and through which the fraud was effected) or its significant concerns regarding the potential for fraud at Refco – especially considering the importance placed by the THL Funds on the Company's financial statements and condition in determining whether to proceed with the investment – the THL Funds could have averted their loss.

**Grant Thornton's Fraudulent And/Or Grossly Negligent Refco Audits**

40.    As the Company's purportedly independent auditor, Grant Thornton had unfettered access to internal Company documents and financial statements from which the fraudulent scheme was, or, if not for Grant Thornton's gross negligence, should have been,

evident or detectable. However, none of this information, much less Grant Thornton's significant concerns regarding the potential for fraud at Refco, was reflected in the Company's financial statements or otherwise disclosed by Grant Thornton to the THL Funds or their advisors, who (as Grant Thornton was aware) were specifically assessing the risks of the contemplated investment.

### Professional Standards Governing Auditors

41.    Auditors are obligated to plan and perform their respective audits in accordance with Generally Accepted Auditing Standards ("GAAS"), and to adhere to the ethical requirements of the accounting profession, including the American Institute of Certified Public Accountants (the "AICPA") Code of Professional Conduct, Rule 202, requiring compliance with GAAS. The AICPA's Auditing Standards Board issues pronouncements, known as Statements on Auditing Standards ("SAS"), that amplify, modify and interpret the general, fieldwork and reporting standards that govern the practice. The SAS have been codified in a volume of professional standards, referred to as auditing interpretations, which are cited as "AU." When conducting an audit, the auditor must consider the SAS and justify any departures therefrom.

42.    The goal of a financial statement audit by an independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, the financial position, results of operations, and cash flows in conformity with generally accepted accounting principles. To achieve this objective, the auditor "has the responsibility to plan and perform the audit to obtain reasonable assurances about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU § 110.02.

43.    An independent auditor is required to plan and perform his or her work with due professional care. Due professional care requires the auditor to exercise professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of

audit evidence. The auditor should use the knowledge, skill and ability called for by the accounting profession to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. "Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit process, professional skepticism should be exercised throughout the audit process." AU § 230.08, SAS 82. In exercising professional skepticism, the auditor "neither assumes that management is dishonest nor assumes unquestioned honesty" and "should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU § 230.09, SAS 82.

44.    AU § 339, titled "Audit Documentation," provides that information contained in working papers constitutes the principal record of the work that the auditor has done and the conclusions reached concerning significant matters. Accordingly, the work papers should contain, among other things, documentation sufficient to show that the audit evidence obtained, the auditing procedures applied, and the testing performed have provided sufficient competent evidential matter to afford a reasonable basis for an opinion. Likewise, SAS 31, titled "Evidential Matter," provides that an opinion on financial statements is not warranted without adequate attention to underlying accounting data (i.e., the auditor bears an obligation to obtain sufficient and competent audit evidence to afford a reasonable basis for an unqualified audit opinion). This obligation requires more than blind reliance on management, as SAS 1, titled "Due Professional Care in the Performance of Work," explicitly states that an auditor should not be satisfied with less than persuasive evidence simply because of a belief that management is honest.

45.     AU § 334, titled "Related Parties," sets forth the requirements for auditing related-party transactions, including the requirement that the auditor "[r]eview accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period." The procedures identified should provide reasonable assurance that identified related-party transactions do not contain misstatements that, when aggregated with misstatements in other balances or classes of transactions, could be material to the financial statements taken as a whole. As in examining other material account balances, the auditor needs to consider the audit risk posed by related-party transactions and then design and apply substantive tests to evaluate management's assertions. "The higher the auditor's assessment of risk regarding related party transactions, the more extensive or effective the audit tests should be." AU § 9334.19. For each material related-party transaction (or aggregation of similar transactions) requiring disclosure, and in order to assess the adequacy of that disclosure, the auditor should consider whether he or she has obtained sufficient competent evidentiary matter to understand the relationship of the parties and the effects of the transaction on the financial statements.

46.     AU § 316, titled "Consideration of Fraud in a Financial Statement Audit," based on SAS 82 (replaced in October 2002 by SAS 99), establishes an auditor's underlying responsibility to obtain reasonable assurance as to whether the financial statements are free of material misstatement.

(a)     SAS 82, in effect prior to October 2002, required an auditor to specifically assess the risk of material misstatement due to fraud.

(b)     SAS 99, which replaced SAS 82 for audit periods ending on or after December 15, 2002, expands the necessary risk assessment and requires discussion or

"brainstorming" among audit engagement personnel regarding the risks of material misstatement

due to fraud. SAS 99 cautions practitioners that management is in a unique position to perpetrate

fraud because of its ability to directly or indirectly manipulate accounting records and prepare

fraudulent financial statements by overriding established controls that otherwise appear to be

operating effectively. Grant Thornton itself has described its SAS 99 obligations as follows:

> SAS 99, *Consideration of Fraud in a Financial Statement Audit*,
> requires us to obtain reasonable assurance that the financial statements are
> free of material misstatement, whether caused by error or fraud.
>
> Inquiries of management relating to fraud:
>
> – Are you aware of any instance of fraud or suspected fraud with
>   respect to the Company?
>
> – What are your views about the risks of fraud with respect to the
>   Company?
>
> – Where/in which areas do you believe that fraud could occur?
>
> – What is your assessments [sic] of the controls in place to prevent
>   and/or detect fraud?

47.    As explained in greater detail below, Grant Thornton failed to follow and

comply with many of the foregoing provisions and interpretations, among others, and failed to

adhere to its own acknowledged obligations during its tenure as the Company's auditor and in

connection with its discussions with the THL Funds and their advisors prior to August 2004

Acquisition.

### Grant Thornton Failed To Properly Audit Refco's Related-Party Transactions

48.    As discussed above (see supra, ¶ 31), Grant Thornton, and AA before it,

had characterized Refco as a "high-risk client." In fact, Grant Thornton was aware that Refco

engaged in substantial and complex related-party transactions, and was also aware of the risks

inherent in transactions of that nature, yet it failed to audit those transactions in accordance with

GAAS or appropriately require the disclosure of their existence. As also discussed above (see supra, e.g., ¶ 45), GAAS requires auditors to pay significant attention to related-party transactions due to the inherent conflicts of interest. In addition:

> (a)    SFAS No. 57, titled "Related Party Disclosures," requires that all related-party transactions be disclosed in the company's financial reports, including the nature of the relationship and a description of the transaction (including the amount in question).

> (b)    SFAS No. 57 warns that "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis." Similarly, AU § 9334, titled "Related Parties: Auditing Interpretations of Section 334," states at paragraph 18: "The risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." AU § 334, titled "Related Parties," provides that independent auditors should be particularly aware of transactions that can be designed or manipulated to obscure related-party transactions.

Notwithstanding these obligations, Grant Thornton did nothing.

49.    In the course of conducting its Refco audits, Grant Thornton came across numerous "red flags" pointing to a fraudulent scheme involving the round-trip loans, but it failed to act on those "red flags," as was its obligation. Indeed, Grant Thornton chose not to even identify any of its concerns for the THL Funds and their advisors, which, had they done so, would have alerted the THL Funds and their advisors to the need for additional investigation, if not enabled them to avoid the investment altogether.

### Grant Thornton Was Aware That Refco Engaged In, But Failed to Disclose Significant Related-Party Transactions

50.    During his tenure at AA, Ramler became familiar with issues concerning Refco's related-party transactions. In fact, when Ramler proposed Refco to Grant Thornton as a client and completed Grant Thornton's new client evaluation form, Ramler indicated that Refco engaged in significant related-party transactions with certain related parties that either had not

been audited or had been audited by firms other than AA. Ramler also brought to Grant

Thornton's attention the existence of material related-party receivables between Refco Group

and RGHI (which entity Ramler described as a shell with no operations other than this

relationship) – totaling approximately $170 million as of February 28, 2002 – and his belief that

related-party transactions between the two entities created a high risk of material misstatement.

51.     In addition, Ramler brought to Grant Thornton's attention the fact that

BAWAG, the former 10% owner of Refco Group prior to the August 2004 Acquisition, was a

related-party with which Refco similarly engaged in substantial related-party transactions.

52.     RGHI and BAWAG were not merely related-parties – they were related-

parties that were not audited by Grant Thornton and, accordingly, should have been viewed by

Grant Thornton with greater skepticism. In such circumstances, Grant Thornton was obligated to

implement additional audit procedures in order to obtain independent verification of the nature of

the subject transactions. Specifically, AU § 334 requires that in auditing related-party

transactions, the auditor "[r]eview accounting records for large, unusual, or nonrecurring

transactions or balances, paying particular attention to transactions recognized at or near the end

of the reporting period." In addition, AU § 9334.19 provides that "[t]he higher the auditor's

assessment of risk regarding related party transactions, the more extensive or effective the audit

tests should be."

53.     But despite its knowledge of related-party transactions between Refco

Group, on the one hand, and both RGHI and BAWAG, on the other hand – again, entities that

were not audited by Grant Thornton – and even after assessing the existence of these transactions

as a "high-risk" factor, Grant Thornton failed to implement any procedures to bring about the

disclosure of the following 17 sham round-trip loan transactions that Refco engaged in with

unrelated entities to hide the RGHI Receivable and mask Refco's true financial condition

(including from the THL Funds and their advisors). Each of these transactions was structured as

described in ¶¶ 19-28, above, and timed to coincide with Refco's February fiscal year-ends and,

beginning in May 2004, Refco's quarter-ends:

(a)    On or about February 25, 2000, Refco engaged in a $150 million sham loan transaction with CIM Ventures, Inc. ("CIM Ventures"), an Ingram Micro, Inc. ("Ingram") subsidiary, which transaction was unwound on March 9, 2000.

(b)    Also on February 25, 2000, Refco engaged in a $110 million sham round-trip loan transaction with CS Land Management, LLC ("CS Land") that was unwound on March 3, 2000.

(c)    Also on February 25, 2000, Refco engaged in a $50 million sham round-trip loan transaction with EMF Core Fund ("EMF") that was unwound on March 3, 2000.

(d)    On February 23, 2001, Refco engaged in a $250 million sham round-trip loan transaction with CIM Ventures that was unwound on March 6, 2001.

(e)    On February 26, 2001, Refco engaged in a $200 million round-trip loan transaction with Delta Flyer that was unwound on March 2, 2001.

(f)    On February 25, 2002, Refco engaged in a $175 million round-trip loan transaction with Delta Flyer that was unwound on March 4, 2002.

(g)    Also on February 25, 2002, Refco engaged in a $125 million round-trip loan transaction with Beckenham Trading Company, Inc. ("Beckenham") that was unwound on March 4, 2002.

(h)    Also on February 25, 2002, Refco engaged in a $325 million round-trip loan transaction with Liberty Corner that was unwound on March 4, 2002. This was the first of ten such round-trip loan transactions that Refco undertook with Liberty Corner.

(i)    On February 21, 2003, Refco engaged in a $150 million round-trip loan transaction with Delta Flyer that was unwound on March 4, 2003.

(j)    Also on or about February 21, 2003, Refco engaged in a $500 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2003.

(k)    On February 20, 2004, Refco engaged in a $720 million round-trip loan transaction with Liberty Corner that was unwound on or about March 4, 2004.

(l)    On May 27, 2004, Refco engaged in a $700 million round-trip loan transaction with Liberty Corner that was unwound on June 7, 2004. This transaction occurred simultaneously with the drafting and negotiating of the Purchase Agreement for the August 2004 Acquisition, which was executed on June 8, 2004.

(m)    On August 25, 2004, Refco engaged in a $485 million round-trip loan transaction with Liberty Corner that was unwound on September 7, 2004.

(n)    On November 26, 2004, Refco engaged in a $545 million round-trip loan transaction with Liberty Corner that was unwound on December 3, 2004.

(o)    On December 30, 2004, Refco engaged in a $550 million round-trip loan transaction with Liberty Corner that was unwound on or about January 5, 2005.

(p)    On February 23, 2005, Refco engaged in a $345 million round-trip loan transaction with Liberty Corner that was unwound on March 8, 2005.

(q)    On May 25, 2005, Refco engaged in a $450 million round-trip loan transaction with Liberty Corner that was unwound on or about June 6, 2005. This transaction occurred as Refco was preparing for its initial public offering of common stock (the "IPO").

54.    That Grant Thornton knew about at least some of these transactions, including their purpose, is evident from Ramler's handwritten notes, which connect the words "Liberty Corner Capital Strategy Fund LLC" with "$450 million . . . contract loan," clearly referring to the May 25, 2005 round-trip loan transaction referred to above. Underneath the reference to Liberty Corner is the phrase "clean up of interco accounts," which is a description of the transaction's purpose that Ramler only could have written if he was aware that these period end transactions were being used to hide related-party receivables.

55.    Furthermore, in connection with its fiscal 2003 audit of RCM, Grant Thornton was aware of both the February 21, 2003 Liberty Corner and Delta Flyer "reverse repo" transactions, in the amounts of $500 million and $150 million, respectively. As Grant

Thornton discovered in the course of that audit, the "trade date" and "maturity date" associated with each transaction – February 21, 2003 and March 4, 2003 – made clear that the transactions straddled the end of Refco's fiscal year, taking effect before year-end and being reversed immediately after the close. Although Grant Thornton performed additional credit risk testing on other RCM customer accounts, the Liberty Corner and Delta Flyer accounts were not selected for additional testing. Instead, and despite the suspicious nature of the transactions, Grant Thornton merely sent confirmation requests to Liberty Corner and Delta Flyer, with no further inquiry into the underlying circumstances.

56.    Grant Thornton discovered another such transaction in connection with its fiscal 2004 audit of RCM – this time another "reverse repo" transaction with Liberty Corner on February 20, 2004 in the amount of $720 million. Again, Grant Thornton sent a confirmation request to Liberty Corner, but this time also undertook an assessment of the potential credit risk associated with the debit balance created by the transaction. Following this assessment, Grant Thornton concluded that the entire $720 million debit balance had no collateral securing it, as is generally required for a "reverse repo" transaction. And, of course, Liberty Corner had no ability to repay its debit balance. Nevertheless, Grant Thornton did not identify Liberty Corner's RCM account as a credit risk, require the disclosure of the debit balance or the "reverse repo" transaction in Refco's audited financial statements for fiscal 2004, or alert the THL Funds to their existence. This was particularly egregious, as Grant Thornton understood from its meetings with KPMG (see, e.g., supra, ¶¶ 36-39, infra, ¶¶ 68-73) that the THL Funds were specifically assessing Refco's risk profile with respect to counter-party credit risk.

57.    Grant Thornton also learned of a November 26, 2004 Liberty Corner transaction, in the amount of $545 million, as well as an RGHI "reverse repo" on the same day in

the same amount, in the course of its interim review of Refco's November 2004 financial

statements, the only difference between these two transactions being the interest rate (Liberty

Corner was being charged 2.00%, while RGHI was being charged 2.75%). Because these

transactions were discovered in connection with a review, as opposed to an audit, Grant

Thornton did not send confirmation requests to Liberty Corner or RGHI. But Grant Thornton

did conduct a credit risk analysis, which showed the Liberty Corner loan to be unsecured. When

Grant Thornton asked management about this transaction, Richard Outridge of RCM stated that

"there had been an [sic] reporting error on recording of the $545 million" and that the "[a]mount

had been adjusted." It appears that Grant Thornton – despite its professional obligations as an

auditor, including those referenced above (see supra, ¶¶ 41-47) – blindly accepted this

explanation and did not further question or investigate the transaction or the possibility of an

internal control weakness that would have allowed such an error to find its way into the

Company's financial statements. Moreover, and even more troubling, it appears that Grant

Thornton made no effort to scrutinize the related-party transaction with RGHI or to understand

why Refco entered into that transaction in the first place.

58.     In addition, in or around the Spring of 2004, when Grant Thornton

performed its re-audit of Refco's fiscal year ended February 28, 2002 – as discussed below (see

infra, ¶¶ 78-79), for purposes of obtaining fiscal 2002 financial statements that complied with

SEC Regulation S-X – Grant Thornton, based on its review of AA's original work papers,

discovered three more of the "reverse repo" transactions referenced above, all straddling the

fiscal year-end, with a "trade date" of February 25, 2002 and a "maturity date" of March 4, 2002

(namely, transactions with Liberty Corner ($325 million), Delta Flyer ($175 million) and

Beckenham ($125 million)). Grant Thornton also discovered that the transactions, despite being

characterized by Refco as "reverse repos," similarly were not secured with the required collateral. Again, Grant Thornton did nothing more than send confirmation requests to Liberty Corner, Delta Flyer and Beckenham.

59.    Remarkably, even though Grant Thornton was aware that (i) Refco participated in related-party transactions with RGHI and BAWAG; (ii) Refco was owed a very large receivable from RGHI; (iii) the receivable had existed for a lengthy period of time; and (iv) the receivable was unsecured – and despite Grant Thornton's knowledge of the round-trip loans designed to hide the RGHI Receivable, which were mischaracterized as "reverse repos" given the absence of underlying collateral – Grant Thornton did nothing to investigate these suspicious, recurring transactions, did not require their disclosure in Refco's audited financial statements, and never informed the THL Funds or their advisors that such questionable transactions were occurring with alarming frequency and regularity.

60.    Grant Thornton was required by GAAS to investigate and obtain supporting evidentiary documentation for the assertions made by the Company in its financial statements and could not merely take the word of the Company's management about the accuracy of those statements. Grant Thornton plainly failed in this regard.

### Grant Thornton Knew That Related-Party Transactions Presented A High Risk Of Misstatement And Should Have Implemented Procedures Aimed At Identifying Them

61.    A 2004 SEC enforcement action against Grant Thornton made the risks associated with related-party transactions even more apparent to the firm. In that action, the SEC alleged that Grant Thornton permitted its audit client MCA Financial Corporation ("MCA") to conceal material related-party transactions, of which Grant Thornton's auditors were allegedly aware, in connection with MCA's SEC filings and public debt offerings. The SEC claimed that Grant Thornton did not adequately plan the audit, act with sufficient skepticism in conducting

the audit, or obtain enough evidence to support its conclusions. Grant Thornton settled the administrative proceeding in exchange for its payment of a fine and its agreement to provide fraud detection training to its audit staff.

62.    As a consequence of this SEC proceeding, Grant Thornton should have been even more skeptical of, and sensitive to the risks associated with, related-party transactions. Instead, Grant Thornton's examination of the related-party receivable from RGHI was wholly ineffective, and Grant Thornton failed to implement procedures for identifying and ensuring the disclosure of that and other significant related-party transactions, such as:

(a)    obtaining the names of all related parties by either requesting the names from management personnel, reviewing Refco's filings with the SEC and other regulatory agencies or identifying guarantors for large receivables;

(b)    determining the trustworthiness of related-party transactions by assessing the extent and nature of the transactions, confirming the amounts and terms of the transactions and evaluating the probability of repayment of uncollected balances; and/or

(c)    reviewing Refco's accounting processes for the large and unusual transactions that were taking place at the end of each reporting period.

63.    In connection with Grant Thornton's audit for the fiscal year ended February 28, 2003, Ramler asked for and obtained, on April 28, 2003, a letter from Bennett representing that RGHI's shareholders intended to reduce the amount of the RGHI Receivable by at least $35 million per year, resulting in full payment by February 28, 2006. But Grant Thornton – despite its knowledge of the RGHI Receivable, the round-trip loans that straddled Refco's fiscal year-ends, and the purpose of those transactions to "clean up" Refco's inter-company accounts – appears to have made no effort to: (i) audit the actual amount of the RGHI Receivable; or (ii) determine if payments were actually being made by RGHI to reduce this debt.

64.    Grant Thornton's conduct also was deficient with respect to its auditing of related-party transactions with BAWAG. Grant Thornton had identified unsecured debit

balances, which would indicate unsecured loans to customers, as a risk area for Refco and

consistently obtained sufficient information to identify a large recurring debit balance in

BAWAG's RCM account as of Refco's fiscal year-ends. Although Grant Thornton had adopted

certain procedures applicable to related-party receivables and other related-party transactions –

such as an assessment of the transaction to verify its business purpose – Grant Thornton failed to

perform any of its own procedures with respect to these recurring debit balances (which, as later

revealed, represented BAWAG funds used by RGHI to effect the fraud), and failed to require

their disclosure or their nature or purpose in either Refco's fiscal 2003 or 2004 consolidated

financial statements.

65.    Grant Thornton's failure to implement procedures for identifying and

ensuring appropriate disclosure of Refco's related-party transactions, and its failure to follow

proper audit procedures regarding the existence and amount of the receivable and the terms on

which it would be repaid, all in violation of GAAS, allowed Bennett to implement his scheme to

offload uncollectible receivables to RGHI while hiding such related-party transactions from the

THL Funds and their advisors and, later, the investing public.

*Grant Thornton Ignored Significant "Red Flags"*
*Indicative Of The Continuing Fraudulent Scheme*

66.    Grant Thornton willfully ignored and/or with gross negligence failed to act

upon (much less alert the THL Funds and their advisors to) numerous "red flags" in connection

with its Refco audit work identified as "fraud risk factors" in AU § 316, including:

(a)    "significant related-party transactions," in light of Grant Thornton's
awareness (and acceptance of the Company's non-disclosure) of the RGHI
Receivable and the hundreds of millions of dollars of loans that appeared
on the Company's books just after the beginning of each accounting
period and then disappeared just before the close of that period;

(b)    "journal entries used on a recurring basis . . . [that were] subject to the
entity's internal controls," including the repeated journal entries made at

every quarter-end and year-end over a period of several years to reflect loans being made to third-parties to conceal the related-party loans to RGHI, which were then reversed following the close; and

(c)     "assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate," in that the Company's allowance for bad debts was dependent on significant and sensitive assumptions, such as its customers' financial condition, the likelihood of payment on receivables and the value of the underlying securities, of which the slightest change would materially alter the Company's financial results.

67.     Despite Grant Thornton's knowledge of and failure to implement appropriate audit procedures regarding the Company's significant related-party transactions, Grant Thornton, throughout the relevant period, continued to issue clean and unqualified audit opinions. By doing so, Grant Thornton wrongly signified to creditors and investors, including the THL Funds and their advisors, that it had determined, as a result of properly conducted audit procedures, that the Company's financial statements were prepared in accordance with GAAP and did not contain materially untrue statements or material omissions.

**Grant Thornton's Misrepresentations And Omissions To The THL Funds And False Or Grossly Negligent Re-Audit Of Refco's Fiscal 2002 Financial Statements**

68.     Throughout the THL Funds' due diligence in connection with the August 2004 Acquisition, Grant Thornton knowingly and/or with gross negligence made material misrepresentations to the THL Funds, their affiliates and advisors as to Refco's true financial condition, and provided clean and unqualified audit opinions for false and materially misleading financial statements, all of which induced the THL Funds to consummate the August 2004 Acquisition. Among other things, Grant Thornton nowhere disclosed to the THL Funds that what appeared to be a good and valid receivable from a third-party customer was actually a receivable from RGHI, an entity controlled by Bennett, representing hundreds of millions of dollars of customer losses and obligations. And, Grant Thornton failed to make such disclosure

notwithstanding its knowledge of, or grossly negligent failure to identify, information directly to

the contrary (including the round-trip loan transactions designed to mask the RGHI Receivable),

not to mention its significant concerns regarding the existence of related-party transactions.

69.    There were several meetings between Grant Thornton and the THL Funds

or their advisors during which the misrepresentations were made.  For instance, representatives

of KPMG, including John Berndsen and Ram Menon, acting on behalf of the THL Funds, met

with representatives of Grant Thornton, including Ramler, on or about February 19, 2004, at

Grant Thornton's New York City offices to discuss Grant Thornton's audit of Refco's

consolidated financial statements for the fiscal year ended February 28, 2003, as well as certain

of the firm's associated audit work papers.  KPMG representatives met again with Ramler and

other Grant Thornton employees in New York City on or about May 7, 2004 to discuss Grant

Thornton's audit of Refco's consolidated financial statements for the fiscal year ended February

29, 2004, as well as certain of the firm's associated work papers – which audit Grant Thornton

undertook after having already met with KPMG, and thus, armed with the knowledge that the

THL Funds were contemplating a significant investment in Refco.

70.    At both the February and May 2004 meetings, Grant Thornton knew that

the THL Funds and their affiliates and advisors were relying on Grant Thornton's representations

in determining whether to proceed with the August 2004 Acquisition.  By letters to Scott Schoen

of THL Partners dated February 16, 2004 and May 4, 2004, Grant Thornton confirmed:

> In connection with the proposed acquisition of Refco Group Ltd., LLC
> (the "Company") by Thomas H. Lee Partners, L.P. ("TH Lee Partners")
> and TH Lee Partners investigation of the financial affairs of the Company,
> the Company has requested that we allow KPMG LLP, who has been
> engaged by TH Lee Partners, access to our workpapers prepared in
> connection with our audit[s] of the February 28, 2003 [and February 29,
> 2004] consolidated financial statements of the Company.  We have
> received authorization from management of the Company to allow KPMG

LLP access to certain workpapers prepared in the course of the audit[s] and to respond to questions related to those workpapers, upon your acceptance of this letter.[3]

71.    Specifically in that context, Grant Thornton, through Ramler and other Grant Thornton employees present at the February and May 2004 meetings, discussed Refco's audited financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, but either purposefully or with gross negligence withheld from KPMG the material information it possessed regarding: (i) Refco's significant related-party transactions, including their existence and the appropriateness of their accounting and disclosure (or lack thereof); (ii) the suspicious, recurring, uncollateralized "reverse repo" transactions that straddled the close of Refco's fiscal year-ends (and certain interim periods), that did not appear to serve any legitimate business purpose, and that were "repaid shortly after each year-end;" or (iii) its long-standing concerns regarding the potential for fraud at Refco.

72.    In addition to these glaring, material omissions, Grant Thornton also made the following representations to KPMG, among others, which Grant Thornton knew at the time to be false:

(a)    the audits did not identify any material unusual, extraordinary and non-recurring income and expense items;

(b)    there were no significant issues with respect to Refco's IT control environment; and

---

[3] Grant Thornton's knowledge of the reliance being placed on its audit work for purposes of the August 2004 Acquisition is also made clear in the firm's July 2004 correspondence with Refco's senior lenders, CSFB, Banc of America and Deutsche Bank, in connection with the issuance of $600 million in senior notes in that transaction: "We have audited the consolidated balance sheets of Refco Group Ltd., LLC and its subsidiaries . . . as of February 29, 2004 and February 28, 2003, and the consolidated statements of income, members' equity, and cash flows for each of the years then ended included in the offering circular, (the 'Offering Circular') for the issuance of $600,000,000 of 9% Senior Subordinated Notes Due 2012 . . . dated July 22, 2004. . . . In our opinion, the consolidated financial statements audited by us and included in the Offering Circular comply as to form in all material respects with accounting requirements of the Act and the related published rules and regulations adopted by the SEC. . . ."

(c)    there were no outstanding accounting or reporting issues or disagreements with Refco's management.

73.    Ramler also made clear to KPMG, during both the February and May 2004 meetings, that Grant Thornton identified Refco's credit risk as the critical audit area and, accordingly, Grant Thornton focused on Refco's receivables from customers. Ramler also stated that reserves were held by Refco for material potential losses.

74.    In addition, the Purchase Agreement for the August 2004 Acquisition contained several representations and covenants relating to the accuracy of Refco's financial statements, as well as ultimately false disclosures regarding the Company's financial health of which Grant Thornton would or, if not for its gross negligence, should have been aware, including:

(a)    **Section 3.9 <u>Financial Statements</u>**, pursuant to which Refco furnished purportedly "true, complete and accurate copies" of its audited financial statements for fiscal years 2002-04, which "present fairly in all material respects the financial position . . . of [Refco] and its subsidiaries . . . and . . . are in conformity with . . . GAAP. . . . [Refco's] books and records . . . have been maintained in all material respects in accordance with applicable accounting requirements, reflect only bona fide transactions [and] are complete and correct. . . . [Refco] maintains systems of internal accounting controls sufficient to provide commercially reasonable assurances that all assets and transactions are accounted for in accordance with GAAP. . . . [N]either [Refco] nor any of the Subsidiaries . . . has any [undisclosed] debt, guaranty, liability, claim or obligation of any nature;"

(b)    **Section 3.10 <u>Absence of Undisclosed Liabilities</u>**, pursuant to which there were "[n]o material undisclosed liabilities;" and

(c)    **Section 3.12 <u>Interests of Officers and Directors</u>**, pursuant to which, and except as separately disclosed, "no officer, manager, director or member of [Refco] . . . has had . . . a material interest in any contract or agreement to which [Refco] . . . is a party."

75.    Many, if not all, of the foregoing representations and/or attestations were reiterated by Grant Thornton during telephone conferences or in regular e-mail correspondence

with the THL Funds and their advisors, including KPMG, between February 2004 and the closing of the August 2004 Acquisition.

76.    Grant Thornton's involvement in the August 2004 Acquisition, however, did not end there, as Grant Thornton was, among other things, directly involved in the discussions and ultimate determination regarding the structure of the transaction. In fact, by late July 2004, Grant Thornton had billed Refco a total of $1.2 million for fees incurred specifically in connection with the August 2004 Acquisition – namely, for: (i) "Accounting and other work related to the transaction;" (ii) "Quarterly reviews;" (iii) "Revised audited financial statements;" (iv) "Comfort letters;" (v) "Review of Offering Circular;" and (vi) "Review of valuations of intangibles."

77.    For the many reasons discussed above (see supra, ¶¶ 40-67), Grant Thornton knew, or was grossly negligent in not knowing, of the falsity of its representations to the THL Funds and their advisors and the consolidated financial statements with respect to which it had issued clean and unqualified audit opinions. As also discussed above, Grant Thornton failed to even apprise the THL Funds or their advisors of the firm's concerns regarding the potential for fraud at Refco – which, at the very least, would have enabled the THL Funds and their advisors to ask more targeted questions or undertake additional analysis or investigation. The THL Funds, which understandably placed a great deal of emphasis on Refco's financial reporting in determining whether to proceed with the investment, reasonably and in good faith relied on Grant Thornton's direct representations regarding the accuracy of Refco's financial statements, the procedures Grant Thornton employed and the conclusions it reached during the course of its audits.

78.  Moreover, the foregoing misrepresentations and omissions continued even after the August 2004 Acquisition. As a condition to the closing of that transaction, Refco required SEC Regulation S-X compliant audited financial statements for the three years prior to fiscal year-end February 29, 2004. As of August 2004, however, Refco did not have available audited financial statements for the fiscal year ended February 28, 2002 that complied with SEC Regulation S-X. Accordingly, in addition to auditing Refco's financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, Grant Thornton undertook a re-audit of Refco's consolidated financial statements for fiscal year 2002. The delivery of these audited (and Regulation S-X compliant) financial statements was made an express closing condition to the August 2004 Acquisition. Section 5.10 of the Purchase Agreement specifically provided in this regard as follows:

> **Section 5.10  2002 Financials.** The Company will use reasonable efforts to attempt to obtain and deliver to the Buyer prior to the Closing (but in any event, no later than sixty (60) days following the Closing) audited financial statements meeting the requirements of Regulation S-X promulgated by the SEC for financial statements included in filings of registration statements under the Securities Act of 1933, as amended, with respect to the Company's fiscal year ended February 28, 2002, which audited financial statements will be consistent with the financial statements covering such periods that previously have been delivered to the Buyer, except as such financial statements may be restated to reflect depreciation of intangible assets as required pursuant to Financial Accounting Standard 141.

79.  Between April and October 2004, Grant Thornton worked to complete the re-audit of Refco's consolidated financial statements for fiscal year 2002 in accordance with the terms of the Purchase Agreement and in an effort to facilitate and induce the THL Funds' investment, updating the THL Funds regularly on the firm's progress (including telephonic updates by Ramler to THL Partners). Grant Thornton eventually completed the audit on or about October 8, 2004, again issuing a clean and unqualified opinion with respect to the Company's

consolidated financial statements, which financial statements again failed to disclose Bennett's

fraudulent scheme or the component transactions Grant Thornton had learned of, but chose not to

scrutinize or disclose, in the course of this very audit (see supra, ¶ 58).

**The Fraud Continues As The Company Prepares To Go Public**

80.     The fraudulent scheme described above continued after the closing of the

August 2004 Acquisition.  As Refco commenced preparation for the IPO, Bennett and his co-

conspirators continued to hide the existence of hundreds of millions of dollars of related-party

transactions.  Again, the THL Funds and their advisors were not aware, and could not with

reasonable diligence have learned, of these fraudulent activities, which had been designed to

induce the THL Funds to proceed with the August 2004 Acquisition.

81.     Refco's Form S-1/A prospectus for the IPO, filed with the SEC on August

8, 2005, contained the following disclosure regarding Grant Thornton:

> Experts . . . The New Refco consolidated balance sheet as of 2/28/05 and
> the related consolidated statements of income, changes in members' equity
> and cash flows for the period 8/6/04-2/28/05 as well as the Refco Group
> consolidated balance sheet as of 2/29/04 and the related consolidated
> statements of income, changes in members' equity and cash flows for the
> period 3/1/04-8/5/04 and for the years ended 2/29/04 and 2/28/03 and
> schedules included in this prospectus and elsewhere in this Registration
> Statement have been audited by Grant Thornton LLP, independent
> registered public accountants, as stated in their reports with respect
> thereto, and is included herein in reliance upon the authority of said firm
> as experts in accounting and auditing.

82.     Shortly thereafter, on or about August 16, 2005, Refco completed its IPO,

pursuant to which underwriters sold 26,500,000 shares of common stock.

**The Fraud Is Revealed**

83.     However, less than two months later, in early October 2005, members of

the Board of Directors of Refco Inc. (including the THL Funds' designees) learned for the first

time of the existence of an approximately $430 million obligation that RGHI owed to Refco.

The Audit Committee of the Board of Directors immediately began an internal investigation into Bennett's actions, retaining independent counsel and a forensic accounting firm. The Company also contacted the SEC, the CFTC and other regulatory bodies to report the wrongdoing.

84.    On October 10, 2005, Refco issued a press release announcing Bennett's manipulation of the Company's financial statements. After the Audit Committee consulted with Refco's independent accountants, Refco further announced that the Company's financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005 and May 31, 2005, taken as a whole, should no longer be relied upon. Shortly thereafter, Bennett was arrested and former Refco Chief Financial Officer Robert Trosten ("Trosten") and former Refco executive Tone Grant have since been indicted in connection with the scheme.

85.    After these developments, Refco's stock price declined precipitously and the NYSE ultimately halted trading. On October 17, 2005, Refco and certain of its subsidiaries or affiliates filed for Chapter 11 bankruptcy protection. Refco's common stock has been delisted and the securities purchased by the THL Funds in the August 2004 Acquisition are now worthless.

86.    As a result of Grant Thornton's knowing and/or grossly negligent failure to disclose to the THL Funds or their advisors the fraudulent scheme or the true nature of its underlying transactions – while at the same time issuing clean and unqualified audit opinions with respect to the Company's financial statements and burying its concerns regarding the potential for fraud at Refco and the existence of questionable period end transactions designed to "clean up" inter-company loans – the THL Funds have suffered damages in an amount to be

determined at trial, including, but not limited to, the hundreds of millions of dollars they lost on their equity investment.

## FIRST CLAIM FOR RELIEF
### (Aiding and Abetting Fraud)

87.    The THL Funds repeat and reallege each of the allegations contained in Paragraphs 1 through 86 inclusive, as if fully set forth herein.

88.    As described in detail above, Bennett and his co-conspirators designed and executed a fraudulent scheme to hide worthless receivables and misrepresent Refco's true financial condition, which had the express goal of inducing the August 2004 Acquisition. This conduct constituted a fraud on the THL Funds.

89.    At all relevant times, Grant Thornton was responsible for auditing and certifying Refco's consolidated financial statements in accordance with both GAAS and GAAP. Grant Thornton, however, did not conduct its audits with the requisite degree of skill and care required by an independent auditor. Instead, Grant Thornton knew, at all relevant times, that Bennett – Ramler's long-time client – was looking to sell a large equity interest in the Company, and that disclosure of the ongoing fraudulent scheme, or even disclosure of its component transactions, would jeopardize Bennett's ability to do so. Thus, Grant Thornton consciously avoided confirming facts or implementing procedures that would have revealed the fraud being perpetrated on the THL Funds. As a result, Grant Thornton failed in its performance of its obligations to Refco and, specifically with respect to the August 2004 Acquisition, the THL Funds.

90.    As described in detail above, Grant Thornton knew of, or willfully ignored, the fraudulent conduct, in whole or in part, described herein. Nevertheless, Grant Thornton issued clean and unqualified audit opinions on the Company's financial statements for

the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004, which

opinions (and, in certain respects, the underlying work papers) Grant Thornton knew were being

reviewed and relied heavily upon by the THL Funds and their advisors, including KPMG. Based

in large part on this information, the THL Funds, through the work of KPMG and their other

advisors, determined to proceed with the August 2004 Acquisition. Thus, Grant Thornton

substantially assisted the fraud perpetrated on the THL Funds by Bennett and his co-conspirators.

91.     As a direct and proximate result of Grant Thornton's actions, the THL

Funds have suffered monetary damages in an amount to be proven at trial, but that is in excess of

$245 million, plus interest.

### SECOND CLAIM FOR RELIEF
### (Misrepresentation)

92.     The THL Funds repeat and reallege each of the allegations contained in

Paragraphs 1 through 91 inclusive, as if fully set forth herein.

93.     At all relevant times, and by virtue of its knowing provision of financial

information and representations to the THL Funds, Grant Thornton was under a duty to act fairly

and in good faith and to completely, truthfully and accurately convey and disclose to the THL

Funds and their advisors all material information relating to Refco and Refco's financial

condition, including the true status of its receivables and the existence and nature of all related-

party transactions. Grant Thornton also was under a duty to refrain from providing information

that it knew or, if not for its gross negligence, should have known was false or misleading.

94.     Grant Thornton possessed unique and specialized knowledge and expertise

with respect to the subject matter of their communications with the THL Funds and their

advisors. At all relevant times, Grant Thornton had superior information about Refco and

repeatedly vouched for the information it provided concerning the Company's financial

condition, including the existence and nature of related-party transactions, knowing that this information was critical to the THL Funds' determination of whether to proceed with the August 2004 Acquisition. The THL Funds specifically relied on Grant Thornton's expertise and Grant Thornton's representations to the THL Funds were made with full knowledge of the confidence they enjoyed.

95.    Grant Thornton breached its duty to the THL Funds to accurately convey all material information by knowingly and/or negligently making the misrepresentations and/or omissions of material fact described herein. Grant Thornton misrepresented (knowingly and/or in gross negligence) to, or knowingly and/or with gross negligence withheld from, the THL Funds the material facts described herein and made such misrepresentations without any reasonable basis to believe them to be true so as to induce the THL Funds to consummate the August 2004 Acquisition.

96.    At the time of the foregoing misrepresentations and omissions, the THL Funds believed the information directly provided by Grant Thornton to be true and acted reasonably and justifiably in reliance thereon by investing in Refco. If the THL Funds had known of the falsity of the material facts that were represented, or had been aware of the material facts that had been withheld, they would not have consummated the August 2004 Acquisition. At all relevant times, Grant Thornton knew that the THL Funds would rely to their detriment on its material misrepresentations and omissions.

97.    As a direct and proximate result of Grant Thornton's actions, the THL Funds have suffered monetary damages in an amount to be proven at trial, but that is in excess of $245 million, plus interest.

### THIRD CLAIM FOR RELIEF
### (Professional Malpractice)

98.    The THL Funds repeat and reallege each of the allegations contained in Paragraphs 1 through 97 inclusive, as if fully set forth herein.

99.    With respect to Refco's consolidated financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, Grant Thornton sought and accepted a duty to conduct audits in accordance with GAAS.

100.    With respect to Refco's consolidated financial statements for the fiscal year ended February 28, 2002, Grant Thornton sought and accepted a duty to conduct a re-audit in accordance with GAAS.

101.    Grant Thornton was obligated to perform these services in a thorough, proper, skillful and diligent manner.

102.    At all relevant times, Grant Thornton was specifically aware that in auditing Refco's consolidated financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, it was to conduct an audit in accordance with GAAS on which the THL Funds would rely in connection with their evaluation of the August 2004 Acquisition.

103.    Moreover, at all relevant times, and at the direction of Refco and the THL Funds, Grant Thornton also was specifically aware that in re-auditing Refco's consolidated financial statements for the fiscal year ended February 28, 2002, it was to conduct an audit in accordance with GAAS that would render those financial statements SEC Regulation S-X compliant as a condition to the closing of the August 2004 Acquisition. And, Grant Thornton was aware that the THL Funds would not have consummated the August 2004 Acquisition absent the representation in the Purchase Agreement that Refco (with the assistance of Grant

Thornton) would deliver SEC Regulation S-X compliant audited financial statements for the fiscal year ended February 28, 2002.

104.    By issuing clean and unqualified audit opinions for financial statements that failed to disclose the numerous related-party transactions between Refco, RGHI and others during the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004 – which Grant Thornton knew were being reviewed and relied on by the THL Funds – Grant Thornton knowingly and/or with gross negligence failed to perform its services as Refco's independent certified public accountant in a thorough, proper, skillful and diligent manner, and failed to take reasonable steps to ensure that it conducted its audits in accordance with GAAS.

105.    Grant Thornton possessed unique and specialized knowledge and expertise with respect to the audit of Refco's consolidated financial statements for the fiscal years ended February 28, 2003 and February 29, 2004, as well as its re-audit of Refco's consolidated financial statements for the fiscal year ended February 28, 2002. At all relevant times, Grant Thornton had superior information about Refco and repeatedly vouched for the information it provided concerning related-party transactions, knowing that this information was critical to the THL Funds' determination to consummate the August 2004 Acquisition. The THL Funds relied on Grant Thornton's expertise and Grant Thornton's statements were made with full knowledge of the confidence they enjoyed.

106.    As a direct and proximate result of Grant Thornton's actions, the THL Funds have suffered monetary damages in an amount to be proven at trial, but that is in excess of $245 million, plus interest.



\*          \*          \*

WHEREFORE, the THL Funds demand judgment against Grant Thornton as

follows:

(a)    awarding damages against Grant Thornton in an amount to be determined at trial, but not less than $245 million, plus interest;

(b)    awarding the costs and disbursements incurred in prosecuting this action, including a reasonable allowance for attorneys' and experts' fees and expenses; and

(c)    granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
August 16, 2007

WEIL, GOTSHAL & MANGES LLP

By: _Greg Danilow_
Greg A. Danilow

767 Fifth Avenue
New York, New York  10153
(212) 310-8000

*Attorneys for Plaintiffs Thomas H. Lee Equity Fund
V, L.P., Thomas H. Lee Parallel Fund V, L.P. and
Thomas H. Lee Equity (Cayman) Fund V, L.P.*