UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

THOMAS H. LEE EQUITY FUND V, L.P.,  :
THOMAS H. LEE PARALLEL FUND V, L.P.,  :
and THOMAS H. LEE EQUITY (CAYMAN)  :      07 Civ. 8663 (GEL)
FUND V, L.P.,  :
   :
     Plaintiffs,  :
  v.  :
   :
GRANT THORNTON LLP,  :
   :
     Defendant.  :
   :

-----------------------------------------------------------------x


# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
# GRANT THORNTON LLP'S MOTION TO DISMISS THE COMPLAINT

Mark C. Hansen
Silvija A. Strikis
James M. Webster III
Rebecca A. Beynon
KELLOGG, HUBER, HANSEN, TODD,
 EVANS & FIGEL P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel.: (202) 326-7900

Greg A. Danilow (GD-1621)
Penny P. Reid (PR-5699)
Anthony J. Albanese (AA-2595)
Joshua S. Amsel (JA-0321)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel.: (212) 310-8000

*Attorneys for Plaintiffs Thomas H. Lee
Equity Fund V, L.P., Thomas H. Lee
Parallel Fund V, L.P. and Thomas H. Lee
Equity (Cayman) Fund V, L.P.*

Dated: January 4, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ..................................................................................................................... 11

I.     THE ACCESS LETTERS DO NOT ABSOLVE GRANT THORNTON OF
       LIABILITY ........................................................................................................... 11

       A.     The Access Letters Do Nothing More Than Attempt To Limit Liability For
              Grant Thornton Having Provided Access To Its "Workpapers" ............................ 11

       B.     The Access Letters Are Insufficient Even To Absolve Grant Thornton Of
              Liability For Simple Negligence ............................................................................ 12

       C.     The Access Letters Do Not And Cannot Exempt The Willful And/Or
              Grossly Negligent Conduct Alleged In The Complaint ......................................... 13

II.    THE COMPLAINT STATES A CLAIM FOR AIDING AND ABETTING FRAUD ............. 15

       A.     The Complaint Adequately Alleges A Strong Inference Of Grant Thornton's
              "Actual Knowledge" Of The Underlying Fraud ..................................................... 17

       B.     The Complaint Alleges Grant Thornton's Conscious Avoidance Of The
              Fraud ...................................................................................................................... 19

III.   THE COMPLAINT STATES CLAIMS FOR MISREPRESENTATION AND
       PROFESSIONAL MALPRACTICE .......................................................................... 20

       A.     Privity Or Its Equivalent Is Not Required For Claims, As Here, Premised On
              Intentional Or Grossly Negligent Conduct ............................................................ 20

       B.     In Any Event, The Complaint Adequately Alleges "Near Privity" ........................ 21

              1.     Grant Thornton Knew That Its Audit Opinions And Representations
                     Were Being Provided To Plaintiffs Specifically In Connection With
                     Their Consideration Of An Investment In Refco ........................................ 22

              2.     Grant Thornton Knew That Its Audit Opinions And Representations
                     Were Central To Plaintiffs' Investment Decision ....................................... 23

              3.     The Complaint Alleges Sufficient Linking Conduct .................................. 25

IV.    THE COMPLAINT ADEQUATELY ALLEGES PLAINTIFFS' RELIANCE ..................... 26

       A.     Whether Plaintiffs Reasonably Relied On Grant Thornton's
              Misrepresentations Is A Factual Question That Cannot Be Resolved On A
              Motion To Dismiss ................................................................................................. 28

       B.     The Access Letters Do Not Preclude A Finding of Reasonable Reliance ............... 28

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases:**                                                                                                            **Page(s):**

AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202 (2d Cir. 2000)................................... 25

Abramowitz v. N.Y. Univ. Dental Ctr., 494 N.Y.S.2d 721 (2d Dep't 1985)................................... 2, 13

Ambassador Factors v. Kandel & Co., 626 N.Y.S.2d 803 (1st Dep't 1995) ....................................... 29

Apollo Fuel Oil v. United States., 195 F.3d 74 (2d Cir. 1999) ........................................................ 19

Bd. of Trs. of the Teamsters Local 918 Pension Fund v. Freeburg & Freeburg, C.P.A.,
    1999 WL 803895 (E.D.N.Y. 1999) ........................................................................................ 23

Caprer v. Nussbaum, 825 N.Y.S.2d 55 (2d Dep't 2006)........................................................ 21, 23, 26

Chavin v. McKelvey, 25 F. Supp. 2d 231 (S.D.N.Y. 1998)................................................................ 28

Cherry v. Joseph S. Herbert & Co., 627 N.Y.S.2d 679 (1st Dep't 1995) ........................................... 26

Cohen v. Koenig, 25 F.3d 1168 (2d Cir. 1994)................................................................................. 17

Country World, Inc. v. Imperial Frozen Foods Co., 589 N.Y.S.2d 81 (2d Dep't 1992)..................... 28

Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536 (1985) ......................... 3, 22, 23, 26

Cromer Fin. Ltd. v. Berger, 2003 WL 21436164 (S.D.N.Y. June 23, 2003)..................................... 20

DIMON Inc. v. Folium, Inc., 48 F. Supp. 2d 359 (S.D.N.Y. 1999).................................................... 29

DaPuzzo v. Reznick Fedder & Silverman, 788 N.Y.S.2d 69 (1st Dep't 2005) ................................... 29

E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F. Supp. 2d 273 (S.D.N.Y. 2006)............................ 29

Fed. Nat'l Mortgage Ass'n v. Olympia Mortgage Corp., 2006 WL 2802092
    (E.D.N.Y. Sept. 28, 2006) ............................................................................................ 22, 23, 27

Foothill Capital Corp. v. Grant Thornton L.L.P., 715 N.Y.S.2d 389 (1st Dep't 2000) ............... 22, 25

Ford v. Grand Union Co., 268 N.Y. 243 (1935) ............................................................................... 19

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., L.L.C.,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007) ........................................................................ 17, 18, 20

Gross v. Sweet, 49 N.Y.2d 102 (1979).............................................................................................. 14

# TABLE OF AUTHORITIES
## (cont'd)

**Cases:**                                                                          **Page(s):**

Harsco Corp. v. Segui, 91 F.3d 337 (2d Cir. 1996)...........................................................28

Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968)..................................................................16

Hi Tor Indus. Park, Inc. v. Chem. Bank, 494 N.Y.S.2d 751 (2d Dep't 1985) ....................29

Houbigant, Inc. v. Deloitte & Touche L.L.P., 753 N.Y.S.2d 493 (1st Dep't 2003)..........17, 22, 25, 29

JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393 (S.D.N.Y. 2004)............................3, 28, 29

JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247 (S.D.N.Y. 2005)........................................17

John Blair Commc'ns, Inc. v. Reliance Capital Group, L.P., 549 N.Y.S.2d 678
    (1st Dep't 1990)................................................................................................23, 26, 27

Kalisch-Jarcho, Inc. v. City of N.Y., 58 N.Y.2d 377 (1983)................................................14

LaSalle Nat'l Bank v. Ernst & Young L.L.P., 729 N.Y.S.2d 671 (1st Dep't 2001) ...........................22

Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y., 273 F. Supp. 2d 436
    (S.D.N.Y. 2003)..........................................................................................................14

N.Y. Univ. v. First Fin. Ins. Co., 322 F.3d 750 (2d Cir. 2003).............................................19

Obremski v. Image Bank, Inc., 816 N.Y.S.2d 448 (1st Dep't 2006) ....................................15

Onbank & Trust Co. v. F.D.I.C., 967 F. Supp. 81 (W.D.N.Y. 1997)...................................30

Orlando v. Kukielka, 836 N.Y.S.2d 252 (2d Dep't 2007)..............................................3, 28

Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., L.L.C.,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) .......................................................................23

Phelps v. Kapnolas, 308 F.3d 180 (2d Cir. 2002) .............................................................22

In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...........................2, 18, 30

Sommer v. Fed. Signal Corp., 79 N.Y.2d 540 (1992)..........................................................14

Steinhardt Group Inc. v. Citicorp, 708 N.Y.S.2d 91 (1st Dep't 2000)..................................29

Ultramares Corp. v. Touche, 255 N.Y. 170 (1931).......................................................25, 26

## TABLE OF AUTHORITIES
### (cont'd)

**Cases:**                                                                              **Page(s):**

Weinberger v. Kendrick, 432 F. Supp. 316 (S.D.N.Y. 1977) ............................................................ 16

White v. Guarente, 43 N.Y.2d 356 (1977) ...................................................................................... 26

Wight v. BankAmerica Corp., 219 F.3d 79 (2d Cir. 2000) ........................................................ 16, 20

Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and Thomas H. Lee Equity (Cayman) Fund V, L.P. (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to defendant Grant Thornton LLP's ("Grant Thornton") motion to dismiss the Complaint (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

Although in its motion to dismiss, Grant Thornton tries to portray itself as "one of the pivotal targets of Refco's fraud,"[1] the Complaint's well-pleaded allegations establish Grant Thornton's long-standing knowledge of Refco's significant historical related-party transactions and the sham round-trip loans through which the fraudulent scheme was effected. In fact, the Complaint's allegations largely overlap with the allegations against Grant Thornton in the related securities class action, which this Court found sufficient to withstand a motion to dismiss.

Moreover, the Complaint here goes significantly further, containing not only allegations of Grant Thornton's misconduct with respect to the investing public, but also specific allegations of misrepresentations and omissions directly to Plaintiffs and their advisors. Despite the duty it assumed to Plaintiffs through specific interactions, Grant Thornton, as Refco's long-time auditor, failed to alert Plaintiffs to information that it was uniquely privy to and from which the fraud was evident. Had Grant Thornton instead been truthful with Plaintiffs (as was its obligation), including by sharing its knowledge of Refco's substantial related-party debt and the suspicious, recurring "reverse repo" transactions designed to conceal it, Plaintiffs' substantial loss could have been averted.

Grant Thornton nevertheless argues that the Complaint should be dismissed based on so-called "customary letter agreements" that grant Plaintiffs access to its audit workpapers (the

---

[1] Refco, Inc. and its predecessors, subsidiaries and affiliates, unless reference is made to a specific entity, are referred to collectively herein as "Refco" or the "Company."

"Access Letters"), which it contends somehow absolve it -- both retroactively and prospectively -- of any and all liability.  That argument fails as a matter of both fact and law because:

(1)     the Access Letters in no way absolve Grant Thornton of liability for its audit opinions, nor its misrepresentations and omissions to Plaintiffs;

(2)     the Access Letters fail to <u>explicitly</u> disclaim liability for Grant Thornton's negligence, and thus, they are insufficient to absolve Grant Thornton of liability for its negligence under New York law.  <u>See</u> <u>Abramowitz</u> v. <u>N.Y. Univ. Dental Ctr.</u>, 494 N.Y.S.2d 721, 723 (2d Dep't 1985); and

(3)     under well-settled New York law, the Access Letters cannot absolve Grant Thornton of liability for the willful and/or grossly negligent conduct alleged in the Complaint.

Grant Thornton's remaining arguments in its motion are similarly unavailing:

<u>First</u>, the Complaint adequately supports a claim for aiding and abetting fraud, as its allegations regarding Grant Thornton's actual knowledge of the fraud are far more detailed than the scienter allegations against Grant Thornton in the securities case that this Court has already found to "'approximate an actual intent to aid in the fraud being perpetrated by the audited company.'"[2]  For example, the Complaint contains detailed allegations that Grant Thornton knew (long before Plaintiffs' investment) of the round-trip loan transactions (including that such transactions were recurring, mislabeled as "reverse repos," and lacked a legitimate business purpose), as well as other significant related-party transactions that it failed to confirm or adequately investigate (much less disclose).  The Complaint also alleges that Grant Thornton categorized Refco as a "high risk client" and stated that the "risk of fraud has to be seriously considered" (Compl. ¶ 31).  Finally, the Complaint cites to certain handwritten notes of Mark Ramler ("Ramler"), the long-time engagement partner on Grant Thornton's Refco audit team (and Arthur Andersen LLP's ("AA") before that), that refer to a May 2005 round-trip loan with Liberty Corner Capital Strategies, LLC ("Liberty Corner")

---

[2] <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007) (Lynch, J.) (citation omitted).

and establish his unmistakable understanding of that transaction's purpose (i.e., the "clean up of interco accounts") (id. ¶ 54).

Second, although privity or its equivalent is not required for claims premised on intentional or grossly negligent conduct, the Complaint nevertheless satisfies the pleading requirements set forth in Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536 (1985). The Complaint alleges that: (i) Grant Thornton knowingly provided to Plaintiffs and their advisors, including KPMG LLP ("KPMG"), audited financial statements for Refco's fiscal years 2003-04, met with KPMG in person at least twice to discuss those audits, and made further representations regarding Refco's financial condition in regular communications with Plaintiffs and their advisors -- all after being informed that Plaintiffs were relying on those representations in deciding whether to invest in Refco; (ii) Grant Thornton's audit opinions and representations regarding its audits, "including [as to] the existence and nature of related-party transactions," were "critical to [Plaintiffs'] determination of whether to proceed with" the investment (id. ¶ 94); and (iii) the delivery of re-audited fiscal 2002 financial statements "was made an express closing condition" of the investment, and thus, "Grant Thornton worked to complete the re-audit . . . updating [Plaintiffs] regularly on the firm's progress (including telephonic updates by Ramler to THL Partners)" (id. ¶¶ 78-79).

Finally, Grant Thornton's challenges to the Complaint's allegations of reliance cannot be resolved on a motion to dismiss, as the reasonableness of Plaintiffs' reliance is "generally left for the trier of fact." Orlando v. Kukielka, 836 N.Y.S.2d 252, 255 (2d Dep't 2007). Moreover, the Access Letters do not preclude a finding of reasonable reliance because they do not deal with issues of reliance in any way and, in any event, Grant Thornton's representations concerned matters "peculiarly within [Grant Thornton's] knowledge," for which Plaintiffs had "no independent means of ascertaining the truth." JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004) (Lynch, J.).

Grant Thornton's motion thus should be denied in its entirety.

## STATEMENT OF FACTS

**The Parties**

Plaintiffs purchased a majority interest in Refco on August 5, 2004 for $452 million. Compl. ¶¶ 2, 39. Defendant Grant Thornton is the U.S. member firm of Grant Thornton International and the fifth largest U.S. accounting firm. Id. ¶ 17. Beginning in the late 1980s and continuing through the audit of Refco's consolidated financial statements for the fiscal year ended February 28, 2002, AA served as Refco's independent auditor. During the final ten years of AA's tenure, Ramler served as the engagement partner on the Refco audit team (after serving in more junior capacities since the 1980s). Id. ¶ 29. When AA ceased functioning as an auditing firm in mid-2002, Ramler joined the New York office of Grant Thornton as a partner and, later that year, proposed Refco as a prospective client. Id. Grant Thornton accepted the engagement in March 2003, with Ramler continuing to serve as the engagement partner. Id.

**The Fraudulent Scheme Of Bennett And His Co-Conspirators**

According to the latest superseding indictment filed by the U.S. Attorneys' Office, starting in the 1990s, Bennett and his co-conspirators engaged in a fraudulent scheme to hide Refco's true financial position from investors, lenders, regulators, and the public. Id. ¶ 19. Refco had incurred a series of substantial losses in the 1990s, due both to its own unsuccessful proprietary trading and to uncollectible receivables (from customers to whom Refco had extended loans that they could not repay). Id. ¶ 20. Rather than allowing Refco to write off these losses, as was required, Bennett and his cohorts embarked on a scheme to hide them and thereby mask Refco's true financial condition. Id.

The scheme involved Refco "selling" these uncollectible losses on credit to Refco-related parties, most notably RGHI, a company controlled by Bennett, which transferred the losses

off Refco's books and created a large receivable that the Refco-related parties owed to Refco.  Id.

¶ 21.  At times, the receivable totaled more than $1 billion (the "RGHI Receivable").  Id.  Then, in

order to make the RGHI Receivable appear to be a valuable receivable from unaffiliated third-party

customers on Refco's financial statements, Bennett and others carried out, with one or more

unaffiliated customers, a series of sham short-term loan transactions straddling Refco's financial

reporting periods that temporarily caused substantially all of the RGHI Receivable to be replaced by a

like-sized receivable from the customers.  Id. ¶¶ 22, 23.  These "round-trip loan" transactions began

as early as February 1998 and continued through at least August 2005.  Id. ¶¶ 22, 27, 53.

 The round-trip loans followed the same general pattern:  (i) just before the close of the

financial reporting period, a Refco entity, generally Refco Capital Markets, Ltd. ("RCM"), would

make a "loan" to a third-party customer; (ii) simultaneously, the customer would make a "loan,"

which was unconditionally and absolutely guaranteed by Refco, in the exact same amount to RGHI;

and (iii) RGHI would use these funds to pay down the RGHI Receivable.  Id. ¶ 23.  As a result, at the

close of each reporting period, Refco's books would show a "loan" to the third-party customer, and

the RGHI Receivable would be gone.  Id.  These transactions were then unwound just a few days

later, after the close of the financial reporting period, with the RGHI Receivable reappearing on

Refco's books.  Id. ¶ 25.  The third-party customers, however, were never at risk:  Refco

unconditionally and absolutely guaranteed all of RGHI's obligations to the customers and

indemnified them against all loss.  Id. ¶ 26.  Bennett stood on both sides of the transactions, signing

the documentation for the loan on behalf of RGHI and, on all but one occasion, the guarantees and

indemnities on behalf of Refco.  Id.

 These arrangements and their individual components (including Refco's guarantees

and indemnities) were required to be disclosed in Refco's financial statements, but were not.  Id. ¶

28.  Rather, Grant Thornton issued clean and unqualified audit opinions with respect to Refco's

consolidated financial statements for the fiscal years ended February 28, 2003, February 29, 2004 and February 28, 2005, which did not disclose the sham round-trip loans, the related-party transactions with RGHI, or the true nature of the RGHI Receivable. Id. ¶ 27.

**Grant Thornton was on Notice of Refco's Fraud from the Outset of Its Engagement**

At the outset of Grant Thornton's Refco engagement, Ramler put Grant Thornton on notice of his significant concerns about Refco. Id. ¶ 50. When Grant Thornton was deciding whether to take Refco on as a new client, Ramler told Grant Thornton that: (i) Refco had engaged in numerous significant transactions with related parties, including RGHI and Bank für Arbeit Und Wirtschaft Und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG"), the Austrian bank that then owned 10% of Refco; (ii) the financial statements of these related parties either were not audited at all or were audited by firms other than Grant Thornton, which obligated Grant Thornton, under Generally Accepted Auditing Standards ("GAAS"), to implement additional audit procedures that Grant Thornton failed undertake; (iii) as of February 28, 2002, a related-party receivable existed between Refco and RGHI in the amount of $170 million; (iv) RGHI was a shell with no operations other than its relationship with Refco; and (v) Ramler believed that these related-party transactions with RGHI created a high risk of material misstatement. Id. ¶¶ 50-52. In fact, Ramler asked for and obtained, on April 28, 2003, a letter from Bennett representing that RGHI's shareholders intended to reduce the RGHI Receivable by at least $35 million per year, and pay it off fully by February 28, 2006. Id. ¶ 63. Yet, despite Ramler's concerns, Grant Thornton "appears to have made no effort to: (i) audit the actual amount of the RGHI Receivable; or (ii) determine if payments were actually being made by RGHI to reduce this debt." Id.

Moreover, Grant Thornton, just like AA before it, classified Refco as a "high-risk client." Id. ¶¶ 31, 53. As Ramler explained in an April 11, 2005 memorandum to the Grant Thornton files -- written when he had roughly two decades of experience auditing Refco (id. ¶ 29) -- the "risk

of fraud has to be seriously considered" in connection with Plaintiffs' acquisition of Refco and a

potential public offering, as Refco's officers stood to gain "considerabl[y]" by "overstating earnings

in presenting the most favorable financial picture." Id. ¶ 31.

### Grant Thornton Learned More About the Fraud Throughout Its Engagement

Numerous and glaring red flags came to Grant Thornton's attention throughout its

Refco engagement. Indeed, facts uncovered by Grant Thornton during its engagement support the

conclusion that it was aware of the sham round-trip loans, the RGHI receivable, and Bennett's

deceitful scheme. These facts include Grant Thornton's discovery:[3]

- in performing its fiscal 2003 audit of RCM, that RCM had engaged in significant, short-term transactions with two third-party customers, Liberty Corner ($500 million transaction) and Delta Flyer, Inc. ("Delta Flyer") ($150 million transaction). Id. ¶ 55. These transactions, which Grant Thornton characterized as "reverse repos" (despite the lack of underlying collateral), straddled Refco's February 28, 2003 fiscal year-end, with "trade dates" of February 21, 2003 and "maturity dates" of March 4, 2003. Id. But Grant Thornton did nothing to investigate these suspicious deals other than to send confirmation requests to the customers. Id.

- in connection with its fiscal 2004 audit of RCM, of another irregular purported "reverse repo" transaction with Liberty Corner, this time a $720 million transaction that similarly took place just prior to the end of Refco's fiscal year (on February 20, 2004). Id. ¶ 56. Even though Grant Thornton learned that the entire $720 million debit balance created by this transaction had no collateral securing it (much like the $500 million year-end transaction with Liberty Corner it became aware of in 2003 (id. ¶ 55)), it did not identify Liberty Corner's RCM account as a credit risk or require Refco to disclose the debit balance or the so-called "reverse repo" transaction in its audited financial statements. Id. ¶ 56.

- during its Spring of 2004 re-audit of Refco's fiscal 2002 financial statements, of three more purported "reverse repo" transactions (with Liberty Corner, Delta Flyer and Beckenham Trading Company, Inc. ("Beckenham")), totaling $625 million, all straddling the fiscal year-end (with "trade dates" of February 25, 2002 and "maturity dates" of March 4, 2002). Id. ¶ 58. Again, although Refco had labeled "reverse repos," none were secured. Id. And, once again, Grant Thornton merely sent confirmation requests to the third-parties. Id.

- in reviewing Refco's interim November 2004 financial statements, of two more plainly suspect transactions, both of which took place on November 26 and again involved Liberty

---

[3] Grant Thornton was well aware of the risks associated with related-party transactions. In 2004, Grant Thornton settled an administrative proceeding brought by the Securities and Exchange Commission (the "SEC"), in which the SEC found that Grant Thornton had knowingly permitted another of its audit clients, MCA Financial Corporation, to conceal material related-party transactions in SEC filings and public debt offerings. Id. ¶ 61.

Corner, now known to Grant Thornton as having already participated in at least three suspicious transactions of $300 million or more. Id. ¶ 57. On that date, RGHI loaned RCM $545 million, and RCM, in turn, loaned Liberty Corner that exact amount (again unsecured), in purported "reverse repo" transactions. Id. Both transactions were in the same amounts ($545 million) and had the same trade dates (November 26, 2004), with the only difference between them being the interest rate: Liberty Corner was charged 2.00%, while RGHI was charged 2.75%. Id. Despite these suspicious circumstances, Grant Thornton simply accepted management's explanation that "there had been an [sic] reporting error on recording of the $545 million" and the "[a]mount had been adjusted." Id. Nor did Grant Thornton scrutinize the related-party transaction with RGHI or attempt to understand why Refco entered into it in the first place. Id.

- of another Liberty Corner transaction in 2005 (see id. ¶ 53(q)), as documented in Ramler's handwritten notes, which clearly refer to a May 25, 2005 round-trip loan transaction with Liberty Corner by connecting the words "Liberty Corner Capital Strategy Fund LLC" with "$450 million . . . contract loan." Id. ¶ 54. Underneath the reference to Liberty Corner, Ramler wrote "clean up of interco accounts," which, fairly read, supports the conclusion that he knew that the Liberty Corner transaction was being used to hide related-party receivables in Refco's "intercompany" accounts. Id.

As discussed further below, these facts, particularized in the Complaint, establish Grant Thornton's long-standing knowledge of the fraud's component transactions, not to mention the gross violation of its obligations as an auditor (id. ¶¶ 41-49, 52).

**Grant Thornton Knew That Plaintiffs Would Rely on Its
Representations Regarding Refco's Financial Condition**

Grant Thornton played a key role in the negotiations that led to Plaintiffs' August 2004 acquisition of a majority stake in Refco (id. ¶ 2) and was directly involved in the structuring of that transaction (id. ¶ 76). As a result, Grant Thornton knew that the integrity of Refco's financial statements and Refco's risk profile were critical to Plaintiffs' investment decision. Id. ¶ 36. Grant Thornton also knew that Plaintiffs were relying on its representations in deciding whether to proceed with the acquisition. Id. ¶ 70.

**Grant Thornton Made Numerous False Representations and
Omitted Numerous Material Facts in Discussions with Plaintiffs**

Throughout Plaintiffs' due diligence process, Grant Thornton materially misrepresented Refco's financial condition to Plaintiffs. Id. ¶ 72. Grant Thornton also withheld from

Plaintiffs material information regarding Refco's related-party transactions and the suspicious, recurring, uncollateralized transactions that straddled the close of Refco's financial reporting periods, including a number with the same small counter-party, Liberty Corner. Id. ¶ 71. Indeed, Grant Thornton failed even to mention to Plaintiffs its long-standing concerns regarding the potential for fraud at Refco (id. ¶ 3), the disclosure of which, at the very least, would have prompted Plaintiffs to undertake a more targeted investigation (id. ¶ 77). Instead, Grant Thornton said nothing.

For example, representatives of Grant Thornton, including Ramler, met with Plaintiffs' advisors from KPMG on February 28, 2004 (to discuss Grant Thornton's fiscal 2003 audit of Refco's financial statements and certain of Grant Thornton's associated workpapers) and on May 7, 2004 (to discuss Grant Thornton's fiscal 2004 audit of Refco's financial statements and certain of Grant Thornton's associated workpapers). Id. ¶ 69. At both meetings, Grant Thornton knew that Plaintiffs and their advisors were relying on Grant Thornton's representations in deciding whether to proceed with the purchase of a majority stake in Refco. Id. ¶ 70. In access letters to Plaintiffs' representatives, dated February 16, 2004, and May 4, 2004 (the "Access Letters"), Grant Thornton acknowledged that information provided to Plaintiffs was "[i]n connection with the proposed acquisition of Refco Group Ltd., LLC (the 'Company') by Thomas H. Lee Partners, L.P. ('TH Lee Partners') and TH Lee Partners' investigation of the financial affairs of the Company." Id.

At these meetings, Grant Thornton did not disclose the material information it possessed regarding Bennett's fraud. Id. ¶ 71. Moreover, Grant Thornton knowingly and falsely represented to KPMG that its audits had not identified material unusual, extraordinary and non-recurring income and expense items; that there were no significant issues with respect to Refco's IT control environment; and that there were no outstanding accounting or reporting issues or disagreements with Refco's management. Id. ¶ 72. In fact, Ramler gave Plaintiffs comfort by representing during both meetings that Grant Thornton had identified Refco's credit risk as the

critical audit area and had targeted its audit on Refco's receivables from customers. But Ramler failed to disclose the existence of the Liberty Corner and other period-end transactions of which it was aware and the absence of collateral securing them. Similar representations were made during regular communications with Plaintiffs and their advisors, including KPMG, between February 2004 and the closing of the purchase. Id. ¶¶ 73, 75.

As Grant Thornton also knew, the purchase agreement for the August 2004 acquisition expressly represented that Refco's financial statements had been prepared in "conformity [with] . . . GAAP," and that Refco's "books and records . . . have been maintained in all material respects in accordance with applicable accounting requirements, reflect only bona fide transactions [and] are complete and correct." Id. ¶ 74. These representations were false. In addition, Grant Thornton knew that the purchase agreement falsely represented that Refco had "[n]o material undisclosed liabilities," and that "no officer, manager, director or member of [Refco] . . . has had . . . a material interest in any contract or agreement to which [Refco] . . . is a party." Id. ¶ 74.

Grant Thornton's material misrepresentations and omissions to Plaintiffs and their advisors continued even after the August 2004 acquisition. In October 2004, Grant Thornton issued a clean opinion in connection with its re-audit of Refco's fiscal year 2002 financial statements. Id. ¶¶ 78-79. During the re-audit, Grant Thornton learned of several facially suspicious transactions, yet did not tell Plaintiffs about them (let alone undertake to evaluate these transactions consistent with an auditor's obligations under GAAS). Id. ¶¶ 58, 79. Likewise, Grant Thornton permitted Refco to include, in the Form S-1/A prospectus filed with the SEC on August 8, 2005 in connection with the initial public offering, a representation that various financial materials and schedules included in the prospectus "have been audited by Grant Thornton LLP, independent registered public accountants, as stated in their reports with respect thereto, and [are] included herein in reliance upon the authority of said firm as experts in accounting and auditing." Id. ¶ 81.

**Plaintiffs Relied, to Their Detriment, on Grant Thornton's Misrepresentations**

In reliance on Grant Thornton's representations that Refco's financial statements presented Refco's financial results fairly and in accordance with GAAP, the professional reputation of Grant Thornton, the GAAS procedures that Grant Thornton claimed to have employed, and the "unqualified" opinions that Grant Thornton issued during the course of its Refco engagement, Plaintiffs invested approximately $452 million in Refco in August 2004. Id. ¶¶ 3, 77. After the disclosure of Bennett's fraud in October 2005, Refco was forced to seek bankruptcy protection. Id. ¶¶ 83-86. Plaintiffs sustained a financial loss of hundreds of millions of dollars as a direct result of Grant Thornton's knowing and/or grossly negligent failure to disclose to Plaintiffs Bennett's fraudulent scheme or the suspect period-end transactions through which it was perpetrated.

**The Fraud Is Revealed**

In early October 2005, Refco's Board of Directors, which included designees of Plaintiffs, learned for the first time of the fraudulent activities by Bennett and his co-conspirators. Id. ¶¶ 10, 83. On October 10, 2005, Refco issued a press release disclosing the discovery of an approximately $430 million receivable owed to Refco by RGHI. Id. ¶¶ 10, 84. As a result, Plaintiffs' Refco interests became worthless, causing Plaintiffs losses of at least $245 million. Id. ¶¶ 10, 85, 86.

## ARGUMENT

## I.    THE ACCESS LETTERS DO NOT ABSOLVE GRANT THORNTON OF LIABILITY

In seeking the Complaint's dismissal, Grant Thornton mistakenly relies on the Access Letters to absolve itself of any and all liability to Plaintiffs. See Br. at 3, 7, 16, 17, 24. Specifically, Grant Thornton emphasizes the Access Letters' supposed disclaimer that it "was not assuming any additional duties or obligations by responding to [KPMG's] requests." Br. at 14; id. at 17 ("[I]n sharing information with KPMG, Grant Thornton did not affirmatively assume a duty; it expressly

disavowed one"). These letters, however, do nothing more than grant Plaintiffs access to Grant

Thornton's workpapers while purporting to disclaim any new "duties or obligations." By their terms,

they do not absolve Grant Thornton of liability for its wrongful actions.

### A.    The Access Letters Do Nothing More Than Attempt To Limit Liability For Grant Thornton Having Provided Access To Its "Workpapers"

As alleged in the Complaint, Thomas H. Lee Partners, L.P. ("THL Partners"), an

affiliate of Plaintiffs, submitted an initial bid for Refco in November 2003 and then a revised bid in

February 2004, at which point THL Partners, on Plaintiffs' behalf, "commenced due diligence for a

potential acquisition." Compl. ¶ 35. Because Refco's financial statements and risk profile were

integral to Plaintiffs' investment decision, Plaintiffs retained KPMG "to conduct a detailed

assessment of the Company's financial reporting for the fiscal years ended February 28, 2002,

February 28, 2003 and February 29, 2004, and the risks of the proposed investment." Id. ¶ 36; see

also id. ¶ 37. To that end, KPMG sought information from Grant Thornton, which, as Refco's long-

time auditor, "was in the unique position of having years of knowledge and experience with Refco, as

well as unfettered access to Company information." Id. ¶ 5; see id. ¶¶ 35-38, 68-75.

Before Grant Thornton provided its workpapers to KPMG, it required that THL

Partners first sign the Access Letters. But as is evident from a plain reading of those letters, their

purpose was limited to allowing KPMG "access to certain workpapers prepared in the course of the

audit and to respond to questions related to those workpapers," and attempting to ensure that Grant

Thornton would not be increasing its risk of liability by providing its workpapers. Def. Exs. B, C;

see also Br. at 7. The Access Letters provide that:

> In consideration for Grant Thornton LLP allowing KPMG LLP access to the workpapers
> referred to above and to the information contained therein, TH Lee Partners agrees that it
> does not acquire any rights as a result of such access that it would not otherwise have had
> and acknowledges that Grant Thornton LLP does not assume any duties or obligations in
> connection with such access. [Emphasis added.]

Read most generously, the Access Letters simply attempted to prohibit Plaintiffs from arguing that Grant Thornton assumed additional duties by granting access to its workpapers. Despite that limited purpose, Grant Thornton attempts to invoke the letters as waivers of any and all liability to Plaintiffs, including liability for its prior and future willful and/or grossly negligent conduct. Even if such a broad waiver were permissible as a matter of law (which it is not), it finds no support in the Access Letters' plain language. Those letters do not even attempt to disclaim liability for Grant Thornton's audit opinions themselves, nor its other misrepresentations and omissions to Plaintiffs.[4] The notion that Plaintiffs, by obtaining access to Grant Thornton's workpapers, unknowingly signed away their right to bring suit against Grant Thornton for its prior or future misconduct -- which conduct was beyond the scope of the Access Letters -- is groundless.

**B.    The Access Letters Are Insufficient Even To Absolve Grant Thornton Of Liability For Simple Negligence**

Moreover, the Access Letters are insufficient to absolve Grant Thornton of liability for even simple negligence (much less for fraud or gross negligence) because they fail to <u>expressly</u> disavow negligence-based claims. New York law "looks with disfavor upon agreements intended to absolve an individual from the consequences of his negligence." <u>Abramowitz</u> v. <u>N.Y. Univ. Dental Ctr.</u>, 494 N.Y.S.2d 721, 723 (2d Dep't 1985) (citations omitted). As a result, purported disclaimers

> are always subjected to the closest of judicial scrutiny and will be strictly construed against their drawer. Thus, parties will not be presumed to have intended to exempt themselves from the consequences of their own negligence in the absence of express and unmistakable language to that effect, or to put it another way, <u>it must clearly appear that the "limitation of liability extends to . . . [the] negligence or other fault of the party attempting to shed his ordinary responsibility"</u> before an exculpatory clause will be given legal effect.

---

[4] These misrepresentations and omissions, upon which the Complaint's claims predominately are premised and which go well beyond Grant Thornton's workpapers (<u>see</u> Compl. ¶¶ 69-73, 75), were made during the February and May 2004 meetings between Grant Thornton and KPMG and reiterated by Grant Thornton "during telephone conferences or in regular e-mail correspondence . . . between February 2004 and the closing of the August 2004 Acquisition."

<u>Id.</u> (citations omitted) (emphasis added); <u>see</u> <u>also</u> <u>Gross</u> v. <u>Sweet</u>, 49 N.Y.2d 102, 108 (1979) ("By and large, if [it] is the intention of the parties" to excuse liability for negligence, "<u>the fairest course is to provide explicitly that claims based on negligence are included</u>") (emphasis added).

Nowhere in the Access Letters does Grant Thornton state it is limiting its liability with respect to any negligence claims that may be asserted against it. Although the Access Letters state that Grant Thornton "assumes no additional responsibility with respect to its audit of the Company's consolidated financial statements," and that "TH Lee Partners agrees that it does not acquire any rights as a result of such access that it would not otherwise have had" (Def. Exs. B, C; Br. at 7-9, 16, 17, 24), the letters make no mention of negligence, much less expressly disclaim liability therefor. The Access Letters thus are insufficient to absolve Grant Thornton of liability even for simple negligence.

### C.    The Access Letters Do Not And Cannot Exempt The Willful And/Or Grossly Negligent Conduct Alleged In The Complaint

Finally, and regardless of how broadly the Access Letters are read, they in no way limit Grant Thornton's liability for the willful and/or grossly negligent conduct alleged in the Complaint. Contrary to Grant Thornton's contention, "an exculpatory agreement, <u>no matter how flat and unqualified its terms</u>, will <u>not</u> exonerate a party from liability under all circumstances." <u>Kalisch-Jarcho, Inc.</u> v. <u>City of N.Y.</u>, 58 N.Y.2d 377, 384 (1983) (emphasis added). Specifically, exculpatory agreements -- even if <u>prospective</u> in nature (as opposed to the <u>retroactive</u> application urged by Grant Thornton here) -- will <u>not</u> exonerate a party for intentional misconduct or gross negligence:

> [A]n exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or, when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit.

<u>Kalisch-Jarcho</u>, 58 N.Y.2d at 385; <u>Sommer</u> v. <u>Fed. Signal Corp.</u>, 79 N.Y.2d 540, 554 (1992);

<u>Net2Globe Int'l, Inc.</u> v. <u>Time Warner Telecom of N.Y.</u>, 273 F. Supp. 2d 436, 449-50 (S.D.N.Y.

2003); see also Obremski v. Image Bank, Inc., 816 N.Y.S.2d 448, 449-50 (1st Dep't 2006) ("[A]

contractual limitation on liability is enforceable except that public policy forbids a party from

attempting to avoid liability for damages caused by grossly negligent conduct") (citations omitted).

   The Complaint makes clear that each of Plaintiffs' claims sound in intentional

misconduct and/or gross negligence:

- First Claim for Relief (Aiding and Abetting Fraud): "Grant Thornton knew of, or willfully ignored, the fraudulent conduct, in whole or in part, described herein." Compl. ¶ 90; id. ¶ 89 ("Grant Thornton knew, at all relevant times, that Bennett . . . was looking to sell a large equity interest in the Company, and that disclosure of the ongoing fraudulent scheme, or even disclosure of its component transactions, would jeopardize Bennett's ability to do so.  Thus, Grant Thornton consciously avoided confirming facts or implementing procedures that would have revealed the fraud being perpetrated on the THL Funds").

- Second Claim for Relief (Misrepresentation): "Grant Thornton misrepresented (knowingly and/or in gross negligence) to, or knowingly and/or with gross negligence withheld from, the THL Funds the material facts described herein and made such misrepresentations without any reasonable basis to believe them to be true so as to induce the THL Funds to consummate the August 2004 Acquisition." Id. ¶ 95.

- Third Claim for Relief (Professional Malpractice): "By issuing clean and unqualified audit opinions for financial statements that failed to disclose the numerous related-party transactions between Refco, RGHI and others during the fiscal years ended February 28, 2002, February 28, 2003 and February 29, 2004 -- which Grant Thornton knew were being reviewed and relied on by the THL Funds -- Grant Thornton knowingly and/or with gross negligence failed to perform its services as Refco's independent certified public accountant in a thorough, proper, skillful and diligent manner, and failed to take reasonable steps to ensure that it conducted its audits in accordance with GAAS." Id. ¶ 104.

See also id. ¶¶ 3, 6-8, 11, 28, 49, 53, 54, 59, 63-79, 86.

   In fact, as discussed at length below (see infra, pp. 16-20), the Complaint alleges that

Grant Thornton had actual knowledge of the fraud being perpetrated at Refco, yet it failed to:  (i) alert

Plaintiffs to that fraud (or the other significant risks of which it was aware) despite knowing that such

information "was critical to the THL Funds' determination of whether to proceed with the August

2004 Acquisition" (Compl. ¶¶ 3, 6-8, 30-31, 66-71, 94); or (ii) implement any audit or investigatory

procedures designed to bring about the fraud's disclosure (id. ¶¶ 50-59, 62-65).  These failures --

coupled with Grant Thornton's affirmative misrepresentations to Plaintiffs and KPMG regarding

Refco's true financial condition (e.g., id. ¶ 72) -- constitute willful and/or grossly negligent conduct rendering ineffective any purported disclaimer in the Access Letters ineffective.

## II.    THE COMPLAINT STATES A CLAIM FOR AIDING AND ABETTING FRAUD

Grant Thornton's argument that Plaintiffs' claim for aiding and abetting fraud should be dismissed because it fails to allege "that Grant Thornton had actual knowledge of the fraud at Refco" (Br. at 20) is without merit.[5]  The crux of Grant Thornton's argument is the following:

> Despite its factual complexity, the Complaint in this case carefully avoids the allegation that Grant Thornton had actual knowledge of the fraud at Refco at any time -- much less before the TH Lee investment.  While the Complaint purports to plead that Grant Thornton was negligent and even reckless in failing to discover the truth, it does not plead that Grant Thornton did, in fact, discover it.

Id. (citations omitted).

Grant Thornton, however, is incorrect that the Complaint fails to allege actual knowledge.  To the contrary, the Complaint specifically alleges, among other things, that "Grant Thornton knew of, or willfully ignored, the fraudulent conduct, in whole or in part, described herein." Compl. ¶ 90 (emphasis added);[6] see also id. ¶ 3 (Grant Thornton's "material and knowing omissions . . . kept hidden the fraudulent scheme then being perpetrated by Phillip Bennett") (emphasis added).

Moreover, to the extent Grant Thornton contends that the Complaint's allegations fail to adequately support the foregoing conclusion, it overstates Plaintiffs' pleading obligations, as "'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" Wight v.

---

[5] Although noting that a claim for aiding and abetting fraud also requires "the commission of a wrongful act by a third party" and "the aider-abettor . . . substantially participat[ing] in th[at] wrongdoing" (Br. at 19 (citations omitted)), Grant Thornton does not separately challenge the Complaint with respect to either of these elements.  Accordingly, Plaintiffs do not separately address these elements herein, other than to state that both are adequately alleged, given the Complaint's detailed allegations of the underlying fraud (e.g., Compl. ¶¶ 9, 10, 19-28, 53, 80-85) and its furtherance by Grant Thornton, including by inducing Plaintiffs' more than $450 million investment in Refco (e.g., id. ¶¶ 1-9, 28, 37-40, 48-79, 86).

[6] Although pled in the alternative, the Complaint's allegations of actual knowledge of the fraud nevertheless are sufficient.  See, e.g., Heit v. Weitzen, 402 F.2d 909, 914 (2d Cir. 1968) (holding that "knew or should have known" allegation adequately set forth alternative theories based on actual knowledge and negligence); see also Weinberger v. Kendrick, 432 F. Supp. 316, 320 (S.D.N.Y. 1977) (for purposes of Section 10(b) claim, alternative "or should have known" allegation "does not, under Rule 8(e)(2) Fed. R. Civ. P., affect the sufficiency of the allegation of knowledge").

Bankamerica Corp., 219 F.3d 79, 91 (2d Cir. 2000) (citation omitted); see also Houbigant, Inc. v.

Deloitte & Touche L.L.P., 753 N.Y.S.2d 493, 497 (1st Dep't 2003) ("[A]t the pleading stage of a

fraud claim against an accountant, the plaintiff need not be able to make an evidentiary showing of

exactly what the accountant knew as to the falsehoods in the certified financial statements"). Rather,

to survive dismissal, the Complaint need only allege facts giving rise to a "strong inference" that the

defendant possessed the requisite knowledge. See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.,

L.L.C., 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007) (citation omitted); JP Morgan Chase Bank v.

Winnick, 406 F. Supp. 2d 247, 252-53 (S.D.N.Y. 2005) (Lynch, J.).[7] As aptly stated in Houbigant:

> Keeping in mind the difficulty of establishing in a pleading exactly what the accounting
> firm knew when certifying its client's financial statements, it should be sufficient that the
> complaint contains some rational basis for inferring that the alleged misrepresentation
> was knowingly made. Indeed, to require anything beyond that would be particularly
> undesirable at this time, when it has been widely acknowledged that our society is
> experiencing a proliferation of frauds perpetrated by officers of large corporations, for
> their own personal gain, unchecked by the "impartial" auditors they hired.
>
>         \*       \*       \*
>
> Accordingly, plaintiffs here need not, at this time, establish the truth of their allegations
> that Deloitte was aware of severe irregularities in [its audit client's] financial statements
> resulting in misstatement of the corporation's net worth. They need only allege specific
> facts from which it is possible to infer defendant's knowledge of the falsity of its
> statements. This they have done.

753 N.Y.S.2d at 498-99 (citations omitted) (emphasis added).[8] As discussed below, the Complaint's

allegations support a strong inference of Grant Thornton's actual knowledge of the fraud.

---

[7] See also Cohen v. Koenig, 25 F.3d 1168, 1174 (2d Cir. 1994) (reversing dismissal where "sufficient facts were pleaded to suggest that plaintiffs may be able to prove that defendants more likely than not knew" of the fraud).

[8] In Houbigant, plaintiffs alleged that Deloitte & Touche LLP ("D&T") identified certain "'reportable conditions'" and "'deficiencies in the design or operation of the [company's] internal control structure,'" but failed to: (i) disclose the deficiencies in its audit report; and (ii) verify the information called into question by the deficiencies. Id. at 496-500. The court found these allegations sufficient to state a claim against D&T for not only aiding and abetting fraud, but also for D&T's own fraud. Id. The allegations here go way beyond what was alleged in Houbigant and, when read in the light most favorable to Plaintiffs, create an even stronger inference of actual knowledge.