A. **The Complaint Adequately Alleges A Strong Inference Of Grant Thornton's "Actual Knowledge" Of The Underlying Fraud**

The Complaint here satisfies the applicable pleading standard.[9] Indeed, this Court previously denied Grant Thornton's motion to dismiss the related securities class action for failure to allege scienter, based on similar allegations. See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 659-60 (S.D.N.Y. 2007).[10] Here, the Complaint's allegations are even more robust, detailing Grant Thornton's knowledge -- long pre-dating Plaintiffs' investment -- of virtually identical, period-end round-trip loan transactions (several with the very same counter-parties (i.e., Liberty Corner) and in very large amounts (i.e., $500 million or more)), including:

- the February 21, 2003 Liberty Corner and Delta Flyer "reverse repo" transactions, in the amounts of $500 and $150 million, respectively. See Compl. ¶ 53(i) & (j). "As Grant Thornton discovered in the course of [its fiscal 2003 audit of RCM], the 'trade date' and 'maturity date' associated with each transaction . . . made clear that the transactions straddled the end of Refco's fiscal year, taking effect before year-end and being reversed immediately after the close. . . . [D]espite the suspicious nature of the transactions, Grant Thornton merely sent confirmation requests to Liberty Corner and Delta Flyer, with no further inquiry into the underlying circumstances." Id. ¶ 55; and

- the February 20, 2004 Liberty Corner "reverse repo" transaction, in the amount of $720 million. See id. ¶ 53(k). "Again, Grant Thornton sent a confirmation request to Liberty Corner, but this time also undertook an assessment of the potential credit risk associated with the debit balance created by the transaction. Following this assessment, Grant Thornton concluded that the entire $720 million debit balance had no collateral securing it . . . [a]nd, of course Liberty Corner had no ability to repay its debit balance. Nevertheless, Grant Thornton did not identify Liberty Corner's RCM account as a credit risk, require the disclosure of the debit balance or the 'reverse repo' transaction in Refco's audited financial statements for fiscal 2004, or alert the THL Funds to their existence." Id. ¶ 56.[11]

---

[9] Although most courts require that a plaintiff plead facts supporting a strong inference that the defendant had actual knowledge of the fraud -- which Plaintiffs have plainly done here -- some courts within this District have found allegations supporting the "conscious avoidance" of actual knowledge sufficient to meet the applicable pleading standard. See, e.g., Fraternity Fund, 479 F. Supp. 2d at 368. As discussed below, the Complaint easily satisfies this standard.

[10] In the securities class action, plaintiffs specifically pointed to, among other things, the "'suspicious timing, recurrent pattern and unusual nature of the related-party transactions'" and "the large size of the sham loans in comparison to Refco's net income" as supporting a strong inference of Grant Thornton's scienter. 503 F. Supp. 2d at 658 (citation omitted).

[11] The Complaint also alleges Grant Thornton's knowledge of, and failure to properly investigate, numerous additional Liberty Corner and other third-party period-end sham round-trip loans, including: (i) the November 26, 2004 Liberty Corner "reverse repo" transaction, in the amount of $545 million, which, as Grant Thornton was aware, coincided with an

Moreover, the Complaint identifies a Ramler handwritten note that, in light of Grant Thornton's long-standing knowledge of the recurring nature of the round-trip loans, only underscores the conclusion that Grant Thornton had actual knowledge of the fraud and the manner in which it masked Refco's true financial condition.[12]  Ramler connected the words "'<u>Liberty Corner</u>'" and "'<u>$450 million . . . contract loan</u>,'" clearly referring to the May 25, 2005 round-trip loan detailed in ¶ 53(q). Compl. ¶ 54 (emphasis added).  Underneath that reference, he wrote "'<u>clean up of interco accounts</u>,'" which reflects an unmistakable understanding of the transaction's purpose -- to facilitate the "clean up" of related-party obligations through a third-party transaction (precisely how the fraud was conducted).  <u>Id.</u> (emphasis added); <u>see</u> <u>also</u> <u>JP Morgan</u>, 406 F. Supp. 2d at 254 (considering facts that "could reasonably be understood to demonstrate . . . actual knowledge of the true purpose of the" fraudulent transactions).  Plaintiffs submit that this note does not reflect new-found knowledge, but rather confirms Grant Thornton's ability to understand the nature of the virtually identical round-trip loan transactions in prior years.[13]  Indeed, the Complaint alleges that Ramler (while at both Grant Thornton <u>and</u> AA) categorized Refco as a "high-risk client" (<u>id.</u> ¶¶ 6, 31, 48) and informed Grant Thornton that "material related-party receivables between Refco Group and RGHI (which entity Ramler described as a shell with no operations other than this relationship) . . . created a high risk of material misstatement." <u>Id.</u> ¶ 50.

---

RGHI "reverse repo" transaction "on the same day in the same amount" (<u>id.</u> ¶¶ 53(n), 57); and (ii) the three February 25, 2002 "reverse repo" transactions with Liberty Corner, Delta Flyer and Beckenham, which Grant Thornton discovered, in the course of its fiscal 2002 re-audit, were all unsecured (<u>id.</u> ¶¶ 53, 58).

[12] It is well-settled that, as an agent of the firm, Ramler's knowledge is imputed to Grant Thornton.  <u>See</u> <u>N.Y. Univ.</u> v. <u>First Fin. Ins. Co.</u>, 322 F.3d 750, 753 n.2 (2d Cir. 2003); <u>Apollo Fuel Oil</u> v. <u>U.S.</u>, 195 F.3d 74, 76 (2d Cir. 1999); <u>Ford</u> v. <u>Grand Union Co.</u>, 268 N.Y. 243, 252 (1935).

[13] In an attempt to downplay the significance of this allegation, Grant Thornton relegates its response to a footnote, characterizes the allegation as mere "speculation about a vague handwritten note," and argues that "even if Plaintiffs' unfounded speculation about this document were correct, it could not possibly support any conclusion about what Grant Thornton knew at the time of TH Lee's investment nine months earlier." Br. at 21 n.6. But in so arguing, Grant Thornton conspicuously ignores the numerous allegations discussed above establishing Grant Thornton's awareness (dating back at least to February 2003) of Refco's repeated and virtually identical period-end dealings with Liberty Corner.

Grant Thornton's actual knowledge of the fraud is sufficiently pled, given (i) the recurring nature of the round-trip loan transactions (which, as discussed above and alleged in the Complaint, first came to Grant Thornton's attention <u>before</u> Plaintiffs' investment in Refco), (ii) Grant Thornton's knowledge that these transactions were mislabeled "reverse repos" because there was no underlying collateral, and (iii) the absence of any apparent legitimate business purpose to the transactions. <u>See</u>, <u>e.g.</u>, <u>Wight</u>, 219 F.3d at 92 (actual knowledge adequately alleged where defendant's account officer, among other things, "knew the Conduit Companies were mere 'shell' companies" and "suspected that there was no business purpose to the" transactions).

### B.   The Complaint Alleges Grant Thornton's Conscious Avoidance Of The Fraud

As discussed above, Plaintiffs' allegations give rise to a strong inference of Grant Thornton's actual knowledge of the ongoing fraud at Refco. To the extent this Court adopts a "conscious avoidance" pleading standard, as other courts in this District have done, the Complaint's allegations easily meet this standard. <u>See</u> <u>Fraternity Fund</u>, 479 F. Supp. 2d at 368; <u>Cromer Fin. Ltd. v. Berger</u>, 2003 WL 21436164, at *9 (S.D.N.Y. June 23, 2003) (referring to conscious avoidance as "a well-established substitute for proof of knowledge"). As Judge Kaplan recently explained in <u>Fraternity Fund</u>, conscious avoidance (as distinguished from constructive knowledge, as Grant Thornton characterizes Plaintiffs' allegations) involves a culpable mental state akin to knowledge:

> [C]onstructive knowledge and conscious avoidance are not equivalent. Constructive knowledge is "[k]knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." Conscious avoidance, on the other hand, occurs when "it can almost be said that the defendant actually knew" because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge." Conscious avoidance therefore involves a culpable state of mind whereas constructive knowledge imputes a state of mind on a theory of negligence. Reflecting this analysis, the Second Circuit has held in the criminal context that conscious avoidance may satisfy the knowledge prong of an aiding and abetting charge. Accordingly, <u>the Court sees no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers</u>.

479 F. Supp. 2d at 368 (citations omitted) (emphasis added).

Here, the Complaint's allegations easily satisfy that standard by making clear that, despite having knowledge that the risk of fraud at Refco was high, that Refco had inadequate internal controls and that Refco was engaging in sham round-trip loan transactions at the end of each quarter, "Grant Thornton did nothing to investigate these suspicious, recurring transactions." Compl. ¶ 59; see also id. ¶ 89 ("Grant Thornton consciously avoided confirming facts or implementing procedures that would have revealed the fraud being perpetrated on the THL Funds.").

### III. THE COMPLAINT STATES CLAIMS FOR MISREPRESENTATION AND PROFESSIONAL MALPRACTICE

#### A. Privity Or Its Equivalent Is Not Required For Claims, As Here, Premised On Intentional Or Grossly Negligent Conduct

Grant Thornton's motion to dismiss Plaintiffs' misrepresentation and professional malpractice claims is predicated entirely on the Complaint's purported failure "to allege a duty owed [by Grant Thornton] to TH Lee." Br. at 11; see also id. ("[T]he Complaint's own allegations make clear that Grant Thornton did not stand in [sic] contractual relationship or 'near-privity' with TH Lee"). That argument, however, is incorrect and misstates the applicable standard. The Complaint does not require allegations of privity because Plaintiffs' claims of misrepresentation and professional malpractice sound in intentional misconduct and gross negligence (see Compl. ¶¶ 95, 104) -- not in simple negligence, as Grant Thornton argues.

As explained in Caprer v. Nussbaum, 825 N.Y.S.2d 55 (2d Dep't 2006):

> Lack of privity is not a bar to an action against an accountant for intentional misrepresentation, or the grossly negligent or reckless conduct that is its functional equivalent for these purposes. "A representation certified as true to the knowledge of the accountants when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet."

Id. at 72 (citations omitted) (emphasis added); see also Houbigant, 753 N.Y.S.2d at 496 (holding that privity rule "'does not emancipate accountants from the consequences of fraud'") (citation omitted); Foothill Capital Corp. v. Grant Thornton L.L.P., 715 N.Y.S.2d 389, 390-91 (1st Dep't 2000) (affirming denial of motion to dismiss claims of gross negligence and recklessness where complaint alleged that "Grant Thornton failed to independently verify information provided to it . . . which [ ] subsequently proved to be fictitious, although Grant Thornton had notice of particular circumstances raising doubts as to the veracity of such information") (citations omitted).

Thus, based on the very same allegations discussed at length above -- i.e., allegations supporting, among other things, Grant Thornton's awareness of the fraud and failure to implement procedures designed to bring about its disclosure -- Plaintiffs' misrepresentation and professional malpractice claims are adequately stated.

### B.   In Any Event, The Complaint Adequately Alleges "Near Privity"

Even assuming arguendo that Plaintiffs' claims sound only in negligence -- which they do not -- the Complaint's allegations are sufficient to satisfy the pleading requirements set forth in Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 546 (1985).[14]  Specifically, to state a claim for an accountant's negligence to a third-party, Credit Alliance established the following prerequisites: "(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must be some conduct on the part of the accountants linking them to

---

[14] "In deciding whether a pleading states a claim on a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all factual allegations set forth in the pleading and draw all reasonable inferences in favor of the claimant." Fed. Nat'l Mortgage Ass'n v. Olympia Mortgage Corp., 2006 WL 2802092, at *3 (E.D.N.Y. Sept. 28, 2006) (citing Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002)). "[T]he Credit Alliance prerequisites need not be pled with particularity." Id. at *11; see also LaSalle Nat'l Bank v. Ernst & Young L.L.P., 729 N.Y.S.2d 671, 674 (1st Dep't 2001) ("[T]he standard guiding us is whether the allegations in the complaint, construed liberally, satisfy each of the three requirements").

that party or parties, which evinces the accountants' understanding of that party or parties' reliance." Id. at 551.[15] Each of these requirements is met here.

### 1. Grant Thornton Knew That Its Audit Opinions And Representations Were Being Provided To Plaintiffs Specifically In Connection With Their Consideration Of An Investment In Refco

Grant Thornton's argument that "Plaintiffs' negligence claims are based on audit opinions that were issued to the client for its own general use in the business community" (Br. at 15), represents a fundamental misunderstanding of the Complaint. Specifically, this argument ignores the multitude of Plaintiffs' allegations regarding Grant Thornton's "knowing provision of financial information and risk assessments central to the THL Funds' investment decision." Compl. ¶ 3; see also id. ¶¶ 2, 4, 37-39, 68-79.[16] The Complaint alleges, inter alia, that:

- Grant Thornton knowingly provided to Plaintiffs and their advisors, including KPMG, audited financial statements for Refco's fiscal years 2003-04, "which Grant Thornton knew were of the utmost importance to the THL Funds' investment decision, purported to present fairly in all material respects the consolidated financial position and operating results of the Company, and . . . were represented by Grant Thornton, among others, to be complete, correct and accurate reflections of Refco's financial position, including as to the value and nature of all receivables and the proper treatment of all related-party transactions." Id. ¶¶ 37, 38;

- Grant Thornton met in person with KMPG at least twice (on or about February 19 and May 7, 2004) to discuss its fiscal 2003 and 2004 audits, the latter having been undertaken by Grant Thornton "after having already met with KPMG, and thus, armed with the knowledge that the THL Funds were contemplating a significant investment in Refco." Id. ¶ 69; see also id. ¶ 70 ("At both the February and May 2004 meetings, Grant Thornton knew that the THL Funds and their affiliates and advisors were relying on Grant Thornton's representations in determining whether to proceed with the August 2004 Acquisition"); and

---

[15] See also Pension Comm. of the Univ. of Montreal v. Banc of Am. Sec., L.L.C., 446 F. Supp. 2d 163, 198-99 (S.D.N.Y. 2006); Fed. Nat'l Mortgage, 2006 WL 2802092, at *11; Bd. of Trs. of the Teamsters Local 918 Pension Fund v. Freeburg & Freeburg, C.P.A., 1999 WL 803895, at *2-3 (E.D.N.Y. 1999); Caprer, 825 N.Y.S.2d at 74; John Blair Commc'ns. Inc. v. Reliance Capital Group, L.P., 549 N.Y.S.2d 678, 680 (1st Dep't 1990).

[16] To that end, the Access Letters, while insufficient to absolve Grant Thornton of liability, nevertheless reflect Grant Thornton's awareness that its workpapers were being provided to Plaintiffs "[i]n connection with the proposed acquisition of Refco Group Ltd., LLC (the 'Company') by Thomas H. Lee Partners, L.P. ('TH Lee Partners')," and that Grant Thornton had "received authorization from management of the Company to allow KPMG LLP access to certain workpapers prepared in the course of the audit[s] and to respond to questions related to those workpapers." Id. ¶ 71 (internal quotation marks omitted) (citation omitted).

- The delivery of re-audited fiscal 2002 financial statements by Grant Thornton "was made an express closing condition to the August 2004 Acquisition." Id. ¶ 78. Thus, "[b]etween April and October 2004" -- both before and after Plaintiffs' investment[17] -- "Grant Thornton worked to complete the re-audit . . . in accordance with the terms of the Purchase Agreement and in an effort to facilitate and induce the THL Funds' investment, updating the THL Funds regularly on the firm's progress (including telephonic updates by Ramler to THL Partners)." Id. ¶ 79.

Moreover, the Complaint articulates misrepresentations and omissions by Grant Thornton -- in the course of its discussions with, and in response to questions by, KPMG, as well as "during telephone conferences or in regular e-mail correspondence with the THL Funds and their advisors" -- that go well beyond its clean and unqualified audit opinions. For example, Grant Thornton misrepresented to KPMG, among other things, that: (i) "[its] audits did not identify any material unusual, extraordinary and non-recurring income and expense items;" (ii) "there were no significant issues with respect to Refco's IT control environment;" and (iii) "there were no outstanding accounting or reporting issues or disagreements with Refco's management." Id. ¶¶ 72, 75; see also id. ¶¶ 73, 74. In fact, despite knowingly providing the THL Funds and their advisors with information to be used in connection with the August 2004 Acquisition, Grant Thornton failed to disclose: (i) "Refco's significant related-party transactions;" (ii) "the suspicious, recurring, uncollateralized 'reverse repo' transactions that straddled the close of Refco's fiscal year-ends (and certain interim periods);" and (iii) "its long-standing concerns regarding the potential for fraud at Refco." Id. ¶¶ 71, 72, 76.

### 2. Grant Thornton Knew That Its Audit Opinions And Representations Were Central To Plaintiffs' Investment Decision

Grant Thornton next argues that the Complaint fails to demonstrate that it "knew when the audit opinions were prepared that entities associated with TH Lee would rely on the opinions" in

---

[17] That the re-audit was not, as Grant Thornton suggests, "completed until after the closing with TH Lee" (Br. at 16 n.6), is thus entirely irrelevant. Rather, what is evident from the Complaint is that the re-audit, much like Grant Thornton's fiscal 2004 audit, was knowingly undertaken by Grant Thornton at the very same time, and thus in clear contemplation of the fact that, Plaintiffs were considering the acquisition of a majority interest in Refco. See Compl. ¶¶ 4, 78-79.

connection with the August 2004 Acquisition. Br. at 13. This argument, however, is similarly unavailing. As set forth in the Complaint and above, Grant Thornton was well aware that:

- "Bennett . . . was looking to sell a large equity interest in the Company, and that disclosure of the ongoing fraudulent scheme . . . would jeopardize Bennett's ability to do so." Compl. ¶ 89;

- its audit opinions would be used by Plaintiffs in connection with their consideration of a potential investment in Refco (in fact, both its fiscal 2004 audit and its fiscal 2002 re-audit were not even commenced until <u>after</u> Grant Thornton had already met with KPMG for this very purpose). See id. ¶¶ 69-70, 78-79;

- KPMG had been specifically engaged by the THL Funds "to conduct due diligence of the Company's finances and accounting and to assess the risks of the investment," for which purposes it met or spoke with Grant Thornton on several occasions. Id. ¶¶ 8, 69; and

- its representations "concerning the Company's financial condition, including the existence and nature of related-party transactions," were "critical to the THL Funds' determination of whether to proceed with the August 2004 Acquisition." Id. ¶ 94.

Indeed, as Refco's outside auditor, "Grant Thornton possessed unique and specialized knowledge and expertise with respect to the subject matter of [its] communications with the THL Funds and their advisors," and thus, its "representations to the THL Funds were made with full knowledge of the confidence they enjoyed." Id.; see also id. ¶¶ 102-05.[18]

Accordingly, with respect to the first two Credit Alliance prerequisites, the Complaint's allegations (including, but not limited to, those referenced above) are distinguishable from the negligence allegations considered in Ultramares Corp. v. Touche, 255 N.Y. 170 (1931), and Houbigant, the two decisions on which Grant Thornton primarily relies. See Br. at 11-13, 15-16. In both cases, the court refused to extend accountant liability to an "indeterminate class of persons who, presently or in the future, might deal with the [accountants] in reliance on the audit." Ultramares, 255 N.Y. at 183; Houbigant, 753 N.Y.S.2d at 495 (affirming dismissal of negligence claim against

---

[18] See also AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 223 (2d Cir. 2000) ("To the extent that the 'no-default' letters were intended to serve the purpose of conveying to the investors that the notes which they held were not in default, E&Y knew what the letters were for and E&Y knew for whom the letters were intended"); Foothill Capital, 715 N.Y.S.2d at 391 (holding that plaintiff "sufficiently pled its reliance on the 1997 report in alleging that, in reliance on that report, it 'refrained from taking steps to collect funds already advanced or to protect its interests by other means'") (citation omitted).

accountant because the complaint identified no "'word or action on the part of [the accountant] directed to plaintiffs'") (citation omitted).[19]

In this case, Grant Thornton's knowing provision of information was "not extended to a faceless or unresolved class of persons, but . . . to a known group possessed of vested rights." White v. Guarente, 43 N.Y.2d 356, 356-57 (1977); Caprer, 825 N.Y.S.2d at 74 ("'While Ultramares made it clear that accountants were not to be liable in negligence on the generalized basis that a contract for professional services creates liability in favor of the general populace, this plaintiff seeks redress, not as a mere member of the public, but as one of a settled and particularized class'") (citation omitted).[20]

### 3. The Complaint Alleges Sufficient Linking Conduct

Lastly, it is clear that the "parties' direct communications and personal meetings resulted in a nexus between them sufficiently approaching privity." Credit Alliance, 65 N.Y.2d at 554 (linking conduct found where "the parties remained in direct communication, both orally and in writing, and, indeed, met together throughout the course of EAB's lending relationship with Majestic Electro, for the very purpose of discussing the latter's financial condition and EAB's need for S&K's evaluation"); Cherry v. Joseph S. Herbert & Co., 627 N.Y.S.2d 679, 682-83 (1st Dep't 1995) (linking conduct found where "there were personal meetings between the parties, prior to the closing date, at which defendant's personnel were aware of the purpose of their certification of Protogs Delaware's solvency, and personally communicated those assurances directly to the plaintiffs"); John Blair, 549

---

[19] The following recitation in Ultramares is further illustrative of Grant Thornton's mistaken reliance: "Nothing was said as to the persons to whom these [copies] would be shown or the extent or number of the transactions in which they would be used. In particular there was no mention of the plaintiff . . . in the summary." 255 N.Y. at 174.

[20] See also John Blair, 549 N.Y.S.2d at 680 (holding that: (i) "it is clear that Touche was aware that Reliance intended to sell the subject divisions [as] . . . members of the Touche audit team were expressly told, in person, by a representative of JHR, that JHR was contemplating purchasing the divisions;" and (ii) "plaintiffs have sufficiently showed that Touche was aware that they were going to use and rely upon the financial statements for the specific purpose of evaluating the opportunity to purchase the divisions") (citation omitted).

N.Y.S.2d at 680 (linking conduct found where "the Touche audit team had several meetings with JHR representatives to discuss the audits").[21]

For example, the Complaint alleges the following linking conduct, sufficient under the foregoing authorities:

- "[R]epresentatives of KPMG, including John Bernsden and Ram Menon, acting on behalf of the THL Funds, met with representatives of Grant Thornton, including Ramler, on or about February 19, 2004, at Grant Thornton's New York City offices to discuss Grant Thornton's audit of Refco's consolidated financial statements for the fiscal year ended February 28, 2003, as well as certain of the firm's associated audit work papers." Compl. ¶ 69.

- "KPMG representatives met again with Ramler and other Grant Thornton employees in New York City on or about May 7, 2004 to discuss Grant Thornton's audit of Refco's consolidated financial statements for the fiscal year ended February 29, 2004, as well as certain of the firms associated work papers." Id.

- Representations relating to, among other things, the accuracy of Refco's financial statements "were reiterated by Grant Thornton during telephone conferences or in regular e-mail correspondence with the THL Funds and their advisors, including KMPG, between February 2004 and the closing of the August 2004 Acquisition." Id. at ¶ 75; see also id. ¶¶ 72-74.

- "Between April and October 2004, Grant Thornton worked to complete the re-audit of Refco's consolidated financial statements for fiscal year 2002 in accordance with the terms of the Purchase Agreement and in an effort to facilitate and induce the THL Funds' investment, updating the THL Funds regularly on the firm's progress (including telephonic updates by Ramler to THL Partners)." Id. ¶ 79; see also supra, p. 24 n.17.

## IV.    THE COMPLAINT ADEQUATELY ALLEGES PLAINTIFFS' RELIANCE

Grant Thornton argues that the Complaint cannot support a finding that Plaintiffs justifiably relied on Grant Thornton's false statements because Plaintiffs were sophisticated investors who undertook their own due diligence, and Grant Thornton, in the Access Letters, expressly stated that its Refco audits "were not intended for the benefit" of Plaintiffs. Br. at 22, 24.

---

[21] See also Fed. Nat'l Mortgage, 2006 WL 2802092, at *11 (to demonstrate linking conduct, "a plaintiff generally must show some form of direct contact between the accountant and the plaintiff, such as a face-to-face conversation, the sharing of documents, or other 'substantive communication' between the parties") (citation omitted).

### A. Whether Plaintiffs Reasonably Relied On Grant Thornton's Misrepresentations Is A Factual Question That Cannot Be Resolved On A Motion To Dismiss

As a threshold matter, the reliance issues Grant Thornton raises are not ones that may be resolved on a motion to dismiss, as the reasonableness of Plaintiffs' reliance is a factual question. See JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 407 (S.D.N.Y. 2004) (Lynch, J.) ("[W]hat constitutes reasonable reliance is 'always nettlesome because it is so fact-intensive'") (citation omitted); Orlando v. Kukielka, 836 N.Y.S.2d 252, 255 (2d Dep't 2007) ("[T]he question of whether a party's reliance is reasonable is generally left for the trier of fact") (citation omitted); Country World, Inc. v. Imperial Frozen Foods Co., 589 N.Y.S.2d 81, 82 (2d Dep't 1992) ("In a fraud action, whether a party could have ascertained the facts with reasonable diligence so as to negate justifiable reliance is a factual question") (citation omitted).

### B. The Access Letters Do Not Preclude A Finding of Reasonable Reliance

Even if the Access Letters somehow operated as liability disclaimers, which they do not (see supra, pp. 11-16), they cannot preclude a finding of reasonable reliance because they do not contain any express provisions disclaiming reliance. See, e.g., Chavin v. McKelvey, 25 F. Supp. 2d 231, 235 (S.D.N.Y. 1998) ("[T]he disclaimer at issue must be adequately specific") (citation omitted). The language cited by Grant Thornton -- i.e., that its Refco audits "were not intended for the benefit" of Plaintiffs -- is not a disclaimer of reliance at all, much less a specific disclaimer sufficient to place Plaintiffs on notice of what they could not reasonably rely upon. See Harsco Corp. v. Segui, 91 F.3d 337, 345 (2d Cir. 1996). In fact, Grant Thornton elsewhere acknowledges in the Access Letters that Plaintiffs will indeed be relying on the information provided to them: "the information acquired as a result of this review of our workpapers will be used by [TH Lee Partners] and those acting on its behalf only in connection with its evaluation of the [August 2004] transaction. . . ." Def. Exs. B, C. The Access Letter thus are insufficient to bar Plaintiffs' claims on this ground, as well.

Moreover, irrespective of the Access Letters, Plaintiffs still were entitled to rely on Grant Thornton's representations regarding Refco's financial statements because such representations concerned matters "'peculiarly within [Grant Thornton's] knowledge'" for which Plaintiffs had "'no independent means of ascertaining the truth.'" JP Morgan, 350 F. Supp. 2d at 410 (citation omitted); see also DIMON Inc. v. Folium, Inc., 48 F. Supp. 2d 359, 369, 371-72 (S.D.N.Y. 1999) (in case involving "extremely sophisticated" plaintiff, even where liability disclaimer was "carefully crafted" and remedies for breach of representations were "finely honed," plaintiff's reliance was a triable issue as the fraud may have been concealed and within defendants' exclusive knowledge).[22]

As detailed above, the Complaint amply alleges material facts peculiarly within Grant Thornton's knowledge that Grant Thornton, either willfully or in gross negligence, failed to disclose to Plaintiffs. Moreover, there is no basis in the Complaint for concluding that Plaintiffs could have uncovered any of these misrepresentations or omissions, even if Plaintiffs had undertaken further inquiry. See, e.g., JP Morgan, 350 F. Supp. 2d at 410 ("It is not at all apparent on this sparse, pre-discovery record, that the true nature of the swaps would have been revealed upon inspection"); E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F. Supp. 2d 273, 289 (S.D.N.Y. 2006) (whether "sophisticated" investor reasonably relied on defendant's fraudulent valuation of a company's asset where the defendant's documentation "would not, on [its] face, have alerted [plaintiffs] to the

---

[22] See also Steinhardt Group Inc. v. Citicorp, 708 N.Y.S.2d 91, 93 (1st Dep't 2000) ("[A] purchaser may not be precluded from claiming reliance on misrepresentations peculiarly within the [defendant's] knowledge, notwithstanding the execution of a specific disclaimer"); Hi Tor Indus. Park, Inc. v. Chem. Bank, 494 N.Y.S.2d 751, 752 (2d Dep't 1985) (specific disclaimer does not preclude recovery for fraud where misrepresentations are peculiarly within defendant's knowledge).

Although the defendants in the foregoing cases were sellers, the New York courts have consistently applied the same principles to other types of defendants, including auditors. See, e.g., DaPuzzo v. Reznick Fedder & Silverman, 788 N.Y.S.2d 69, 70 (1st Dep't 2005) (noting, in a fraud case against an auditor, that it may be "impossible to state in detail the circumstances constituting the fraud, inasmuch as the surrounding circumstances are sometimes peculiarly within the knowledge of the party against whom the claim is being asserted"); Houbigant, 753 N.Y.S.2d at 498 (same); Ambassador Factors v. Kandel & Co., 626 N.Y.S.2d 803, 806 (1st Dep't 1995) (denying a motion to dismiss fraud claims against an accounting firm and holding that because "the facts surrounding the fraud [were] peculiarly within the knowledge of the [accounting firm]," the complaint "warrant[ed] granting plaintiffs the opportunity to prove their allegations at trial.").

potential fraud" was factual question) (citation omitted); Onbank & Trust Co. v. F.D.I.C., 967 F. Supp. 81, 86 (W.D.N.Y. 1997) (whether information was made available during due diligence and whether loan irregularities would have been detected by sophisticated investor was factual question).[23]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Grant Thornton's motion to dismiss the Complaint in its entirety.

Dated: New York, New York
January 4, 2008

| | |
|---|---|
| Mark C. Hansen<br>Silvija A. Strikis<br>James M. Webster III<br>Rebecca A. Beynon<br>KELLOGG, HUBER, HANSEN, TODD,<br>  EVANS & FIGEL P.L.L.C.<br>Sumner Square<br>1615 M Street, N.W., Suite 400<br>Washington, D.C. 20036<br>Tel.: (202) 326-7900 | By: _/s/_<br>Greg A. Danilow (GD-1621)<br>Penny P. Reid (PR-5699)<br>Anthony J. Albanese (AA-2595)<br>Joshua S. Amsel (JA-0321)<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Tel.: (212) 310-8000<br><br>*Attorneys for Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P. and Thomas H. Lee Equity (Cayman) Fund V, L.P.* |

---

[23] Grant Thornton implies that "information about Refco's past practices for accounting for customer trading losses" might not have been material to Plaintiffs' investment decision, asserting that Plaintiffs "received a tip before the investment that Refco had been 'sloughing off' trading losses into a subsidiary whose financial statements were not consolidated with Refco's," but "proceeded with the investment anyway." Br. at 22 n.7. The suggestion that Plaintiffs would not have found material the current existence of undisclosed hundreds of millions of dollars of undisclosed related-party debt and fraudulent round-trip loan transactions is absurd. In any case, Grant Thornton's arguments are not properly resolved on a motion to dismiss. Refco, 503 F. Supp. 2d at 623 ("The Court's task is 'not to weigh' the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient") (citation omitted).