UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
THOMAS H. LEE EQUITY FUND V, L.P.,                          :
THOMAS H. LEE PARALLEL FUND V, L.P.,                        :
and THOMAS H. LEE EQUITY (CAYMAN)                           :
FUND V, L.P.,                                               :
                                                            :
                        Plaintiffs,                         :
                                                            :            07 Civ. 8663 (GEL)
                -v.-                                         :
                                                            :            **OPINION AND ORDER**
GRANT THORNTON LLP,                                         :
                                                            :
                        Defendant.                          :
                                                            :
------------------------------------------------------------x

Greg A. Danilow, Penny P. Reid, Anthony J.
Albanese, Joshua S. Amsel, Weil, Gotshal & Manges
LLP, New York, NY, and Mark C. Hansen, Silvija A.
Strikis, James M. Webster III, Rebecca A. Benyon,
Kellogg, Huber, Hansen, Todd, Evans & Figel
P.L.L.C., Washington, DC, for plaintiffs.

David E. Mollón, Bradley E. Lerman, Catherine W.
Joyce, Linda T. Coberly, Winston & Strawn LLP,
New York, NY and Chicago, IL, and Margaret
Maxwell Zagel, Kenneth Cunningham, Grant
Thornton LLP, Chicago, IL, for defendant.


GERARD E. LYNCH, District Judge:

        Plaintiffs Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., and

Thomas H. Lee Equity (Cayman) Fund V, L.P., are investment funds associated with Thomas H.

Lee Partners, L.P. ("THL"), a private equity firm.  Together, plaintiffs invested more than $450

million in Refco and acquired the majority of Refco's stock through a leveraged buy-out

("LBO") in August 2004.  Following Refco's collapse in the fall of 2005, plaintiffs' Refco

interests became worthless, allegedly causing them losses in excess of $245 million.  Plaintiffs

bring this action against Refco's outside auditor, defendant Grant Thornton LLP, claiming that it made numerous misrepresentations to them in connection with the LBO. The complaint, which was originally filed in the New York State Supreme Court, asserts state law claims for aiding and abetting fraud, negligent and intentional misrepresentation, and professional malpractice. Defendant removed the case to this Court pursuant to 28 U.S.C. § 1334(b), and now moves to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6). The motion will be granted in part, and denied in part.

## BACKGROUND

### I.    The Alleged Refco Fraud

This action is another in a series of lawsuits arising out of the implosion of Refco, which prior to its collapse, was among the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets. See In re Refco, Inc. Sec. Litig., No. 07 Civ. 11604, 2008 WL 1827644, at *1 (S.D.N.Y. April 21, 2008). According to the complaint, Refco incurred significant losses in the 1990s as a result of both its own unsuccessful proprietary trading and receivables that became uncollectible when customers could not repay the loans that Refco had extended to them. (Compl. ¶ 20.[1]) Rather than disclosing these losses and "writing them off as required," Refco's CEO, Phillip R. Bennett, allegedly "embarked on a fraudulent scheme to hide them and thereby mask Refco's true financial condition." (Id.)

The first step of the purported scheme involved Refco removing the uncollectible receivables from Refco's books by transferring them to Refco Group Holdings, Inc. ("RGHI"), a

---

[1] All references to the complaint in this opinion are to the complaint originally filed in the New York State Supreme Court. All factual allegations in the complaint are assumed to be true for purposes of this motion. See Merritt v. Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001).

company controlled by Bennett that was not consolidated with other Refco entities, thereby

creating a large receivable that RGHI owed to Refco that at times totaled more than $1 billion.

(Id. ¶ 21.)  In order to make the RGHI receivable appear to be a valuable receivable from

unaffiliated third-party customers, Bennett allegedly orchestrated a series of sham "round-trip

loan" transactions with unrelated entities that temporarily caused all of the RGHI receivable to

be replaced by like-sized receivables from the customers.  According to the complaint, all the

round-trip loans followed the same general pattern:

> (i) just before the close of the financial reporting period, a Refco
> entity . . . would make a "loan" to a third-party customer, (ii)
> simultaneously, the customer would make a "loan," which was
> unconditionally and absolutely guaranteed by Refco, in the exact
> same amount to RGHI; and (iii) RGHI would use these funds to
> pay down the RGHI Receivable.  As a result, at the close of each
> reporting period, Refco's books would show a "loan" to the third-
> party customers, and the RGHI Receivable would be gone.  These
> transactions were then unwound just a few days later, after the
> close of the financial reporting period, with the RGHI Receivable
> appearing on Refco's books.

(P. Mem. 5, citing Compl. ¶¶ 23, 25.)  To enable the third-party customers to profit from this

arrangement, the interest rate that RGHI paid the customers for their "loans" was between 15 and

100 basis points higher than the interest rate that the customers paid Refco on the Refco "loans."

(Compl. ¶ 24.)  Although characterized as loans, generally no funds were actually transferred

other than the customer's profit from the interest spread.  (Id.)

Refco allegedly engaged in seventeen such round-trip loans from February 1998 through

August 2005.  (Id. ¶¶ 22, 27, 53.)  Through these sham transactions, Refco executives were able

to disguise Refco's true financial condition with the aim of "eventually reap[ing] millions of

dollars from the sale of all or part of Refco."  (Id. ¶ 27.)

## II.    Grant Thornton's Refco Engagement

Beginning in the late 1980s through the audit of Refco's financial statements for the 2002 fiscal year, Arthur Anderson ("AA") served as Refco's independent auditor.  (Id. ¶ 29.)  Mark Ramler served as the engagement partner on the Refco audit team during the final ten years of AA's engagement.  (Id.)  When AA ceased functioning as an audit firm in mid-2002, Ramler joined the New York office of defendant Grant Thornton LLP ("GT").  Later that year, Ramler proposed Refco as a prospective client to GT.  In March 2003, GT accepted Refco as a client and Ramler continued to serve as the engagement partner on the Refco account.  (Id.)

At the outset of the Refco engagement, Ramler put GT on notice of certain concerns he had about Refco's finances.  (Id. ¶ 50.)  In particular, Ramler informed GT that Refco had engaged in significant related-party transactions with certain entities that either had not been audited or had been audited by firms other than AA, and that as of February 28, 2002, a related-party receivable existed between Refco and RGHI in the amount of $170 million.  (Id.)  Ramler also conveyed to GT his belief that "related-party transactions between [Refco and RGHI] created a high risk of material misstatement."  (Id.)  Despite its knowledge of these related-party transactions, however, GT allegedly "failed to implement any procedures to bring about the disclosure of the . . . 17 sham round-trip loan transactions."  (Id. ¶ 53 (emphasis omitted).)

## III.    The LBO Transaction

In June 2004, plaintiffs, which are all investment funds associated with the THL private equity firm, agreed to invest approximately $450 million in Refco through a leveraged buy-out.[2]

---

[2] Specifically, plaintiffs "acquired from RGHI roughly a majority of the equity interests in Refco for approximately $452 million in cash."  (Compl. ¶ 39.)

4

(Id. ¶ 2.)  Over the course of more than ten months leading up to the closing of the LBO in

August 2004, plaintiffs engaged in extensive due diligence with the aid of several third-party

consultants and advisors, including KPMG LLP ("KPMG"), which plaintiffs hired to perform

accounting due diligence.  (Id. ¶¶ 2, 36.)  KPMG was "specifically tasked by [plaintiffs] to

conduct a detailed assessment of [Refco's] financial reporting for the fiscal years ended February

28, 2002, February 28, 2003 and February 24, 2004, and the risks of the proposed investment."

(Id. ¶ 36.)

        In the course of its making its assessment, KPMG examined Refco's audited financial

statements, which were prepared by AA for the 2002 fiscal year and by GT for the 2003 and

2004 fiscal years.  (Id. ¶ 37.)  Both AA and GT issued clean and unqualified audit opinions

during each of those fiscal years with no mention of any of the round-trip loans or related-party

transactions with RGHI.  (Id. ¶¶ 27, 37.)  THL, on behalf of its advisor KPMG, also requested

access to certain audit work papers (e.g., consolidation schedules, audited financial statements of

Refco subsidiaries, audit confirmations, and other regulatory work papers) prepared by GT in

connection with its audits.  (See id. ¶ 38.)  GT granted THL and KPMG access to its workpapers

under certain terms and conditions set forth in two letters dated February 16, 2004, and May 4,

2004 ("Access Letters"), each of which was executed by representatives of GT, THL, and

KPMG.  (Braun Decl. Exs. B & C.)  The Access Letters stated expressly that GT's audits for

fiscal years 2003 and 2004, along with the workpapers prepared in connection with them,

> [were] not planned or conducted in contemplation of the proposed
> [LBO] transaction between [THL] and [Refco] . . . , were not
> intended for the benefit of [THL] and should not be taken to
> supplant other inquiries and procedures that [THL] should
> undertake for the purpose of satisfying itself about the financial

condition of [Refco] or as to other matters pertinent to the
transaction . . . .

(Id.)  The Access Letters also made clear that THL "does not acquire any rights" as a result of

gaining access to GT's workpapers, and that GT "does not assume any duties or obligations in

connection with such access."  (Id.)  Furthermore, the Letters authorized GT and KPMG "to

discuss with each other any questions raised during the course of the review," but provided that

"it is expressly understood that [GT] thereby assumes no additional responsibility with respect to

its audit of [Refco's] consolidated financial statements."  (Id.)

Subject to these disclaimers, GT provided KPMG with access to its workpapers and met

with KPMG representatives on February 19, 2004, and May 7, 2004, to discuss GT's 2003 and

2004 audits.  (Compl. ¶¶ 69, 71.)  During those two meetings, Ramler and other GT personnel

allegedly failed to disclose the information they possessed regarding, *inter alia*, the round-trip

loan transactions and Ramler's concerns regarding the potential for fraud at Refco.  (Id. ¶ 71.)

GT personnel also represented to KPMG at the two meetings that (1) its audits for the 2003 and

2004 fiscal years "did not identify any material, unusual, extraordinary, and non-recurring

income and expense items"; (2) "that there were no significant issues regarding Refco's IT

control environment"; and (3) "there were no outstanding accounting or reporting issues or

disagreements with Refco's management."  (Id. ¶ 72.)  GT allegedly reiterated "[m]any, if not

all" of these representations during "telephone conferences or in regular email correspondence"

with THL and its advisors between February 2004 and the closing of the LBO transaction.  (Id.

¶ 75.)

Upon completion of due diligence, plaintiffs in August 2004 consummated the LBO

transaction and acquired a majority ownership interest in Refco as well as numerous seats on

6

Refco's Board of Directors.[3]  (See id. ¶ 83.)  As an express condition to the closing of the

transaction, Refco was required to deliver to plaintiffs audited financial statements compliant

with SEC Regulation S-X for, *inter alia*, fiscal year 2002.  (Id. ¶ 78.)  Because Refco's existing

financial statements for the 2002 fiscal year (which were audited by AA) did not comply with

SEC Regulation S-X, GT performed a reaudit of those statements.  (Id.)  According to the

complaint, GT updated plaintiffs "regularly" on the progress of the reaudit between April and

October 2004.  (Id. ¶ 79.)  GT issued a clean and unqualified reaudit opinion for Refco's 2002

financial statements on or about October 8, 2004, which again failed to disclose any components

of the alleged fraudulent scheme.  (Id.)

## IV.    Refco's IPO and Revelation of Fraud

On August 16, 2005, approximately one year after the consummation of the LBO

transaction, Refco conducted its initial public offering ("IPO"), which resulted in its

underwriters selling 26,500,000 shares of common stock.  (Id. ¶ 82.)  Two months later, on

October 10, 2005, Refco announced that it had discovered an undisclosed $430 million

receivable due from an entity (i.e., RGHI) controlled by Bennett.  (Id. ¶ 83.)  As a result, the

company announced that its financial statements for the preceding four years could no longer be

relied upon.  (Id. ¶ 84.)  Following these disclosures, Refco's stock plummeted and was de-listed

by the New York Stock Exchange, leading to over $1 billion in lost market capitalization.  See In

---

[3] As a result, THL entities and affiliated individuals have been named as defendants in several lawsuits alleging securities or tort claims based on their own alleged role in the Refco fraud.  See, e.g., In re Refco, Inc. Sec. Litig., No. 05 Civ. 8626 (S.D.N.Y.) (GEL); Kirschner v. Thomas H. Lee Partners, L.P., No. 07 Civ. 7074 (S.D.N.Y.) (GEL); In re Refco Capital Markets, Ltd., Brokerage Customer Sec. Litig., No. 06 Civ. 643 (S.D.N.Y.) (GEL); V.R. Global Partners, L.P. v. Bennett, No. 07 Civ. 8686 (S.D.N.Y.) (GEL); Capital Mgmt. Select Fund Ltd. v. Bennett, No. 07 Civ. 8688 (S.D.N.Y.) (GEL).  (D. Mem. 5-6.)

re Refco, 2008 WL 1827644, at *1.  On or about October 17, 2005, Refco and certain of its

subsidiaries filed for Chapter 11 bankruptcy protection.  (Compl. ¶ 85.)

## V.    Plaintiffs' Claims

As a result of Refco's collapse, plaintiffs' Refco interests became worthless, allegedly

causing them losses in excess of $245 million.  (Id. ¶¶ 91, 97, 106.)  On August 16, 2007,

plaintiffs filed this action against GT alleging that it made numerous misrepresentations to them

in connection with the August 2004 LBO.  Plaintiffs claim that had GT been truthful about

Refco's finances, they would not have engaged in the LBO, thus avoiding their substantial loss.

The complaint, which was originally filed in the New York State Supreme Court, advances state

law claims of aiding and abetting fraud, negligent and intentional misrepresentation, and

professional malpractice.  GT subsequently removed the action to this Court pursuant to 28

U.S.C. § 1334(b), and now moves to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6).

## DISCUSSION

## I.    Motion to Dismiss Standard

A defendant must meet a stringent standard in order to obtain dismissal for failure to state

a claim.  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is

entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974),

abrogated on other grounds, Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982); accord, e.g.,

Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006).

However, a complaint may be dismissed pursuant to Rule 12(b)(6) where the complaint

fails to plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic v.

Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007).  As the Second Circuit has instructed,

Twombly requires that a plaintiff satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1964-65 (internal quotation marks omitted). In order to state a claim, the factual allegations contained in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965.

When deciding a 12(b)(6) motion, the Court must take as true the facts as alleged in plaintiff's complaint. Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006); Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995). All reasonable inferences must be drawn in the plaintiff's favor. Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004). However, "[g]eneral, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint." Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995).

## II.    Negligence Claims

GT contends that plaintiffs' two negligence claims — negligent misrepresentation and professional malpractice[4] — must be dismissed because the complaint fails to allege any duty of reasonable care owed by GT to plaintiffs. Under New York law, to state a claim for both of

---

[4] See Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 15 (2d Cir. 2000) (noting that "[u]nder New York law, professional malpractice is a species of negligence" (internal quotation marks and alteration omitted)); Cromer Finance Ltd. v. Berger, 137 F. Supp. 2d 452, 495 (S.D.N.Y. 2001).

these negligence-based causes of action, a plaintiff must allege, *inter alia*, that the defendant is bound to it "by some relation or duty of care." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 788 (2d Cir. 2003); see Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC, 446 F. Supp. 2d 163, 198 (S.D.N.Y. 2006). In ordinary commercial contexts, liability does not attach as a matter of course for merely negligent statements; rather, it is imposed "only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Kimmell v. Schaefer, 89 N.Y.2d 257, 263 (1996). As courts have noted, such specialized knowledge usually arises due to the speaker's status as a professional, such as an accountant, with a particular background in the subject of the alleged misrepresentation. Id.; Doehla v. Wathne Ltd., Inc., No. 98 Civ. 6087, 1999 WL 566311, at *19 (S.D.N.Y. Aug. 3, 1999). A special relationship may be brought about by "either actual privity of contract between the parties or a relationship so close as to approach that of privity." I.L.G.W.U. Nat'l Retirement Fund v. Cuddlecoat, No. 01 Civ. 4019, 2004 WL 444071, at *3 (S.D.N.Y. Mar. 11, 2004), quoting Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood, 80 N.Y.2d 377, 382 (1992).

Where, as here, plaintiffs advance negligence claims against a defendant accounting firm with whom they have no contractual relationship, plaintiffs must satisfy three prerequisites to establish that the parties' non-privy relationship gave rise to a duty of care: "(1) the accountant must have been aware that [his representations] would be used for a particular purpose; (2) in furtherance of which a known party was intended to rely; and (3) some conduct by the accountant 'linking' him . . . to that known party." Securities Investor Prot. Corp. v. BDO

10

Seidman, LLP, 222 F.3d 63, 73 (2d Cir. 2000); see Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 551 (1985); Cromer Finance Ltd. v. Berger, 137 F. Supp. 2d 452, 495-96 (S.D.N.Y. 2001).  Conduct qualifies as "linking conduct" if it is "some form of direct contact between the accountant and the plaintiff, such as face-to-face conversation, the sharing of documents, or other substantive communication between the parties," BDO Seidman, 222 F.3d at 75 (internal quotation marks omitted), that "evinces the accountant['s] understanding of [plaintiff's] reliance" on his representations.  Credit Alliance, 65 N.Y.2d at 551.

To support their contention that GT owed them a duty of care notwithstanding the lack of privity between them, plaintiffs point to: (1) GT's provision of Refco's audited financial statements for fiscal years 2003 and 2004 to plaintiffs; (2) the two meetings on February 19 and May 7, 2004, at which GT employees met with KMPG to discuss the 2003 and 2004 fiscal year audits; and (3) GT's issuance of reaudited fiscal year 2002 financial statements, the delivery of which to plaintiffs was made an express closing condition to the LBO transaction.  (P. Mem. 23-24, 27.)  Each of these grounds purportedly giving rise to a duty of care is examined below.

A.    GT's Provision of 2003 and 2004 Audits

Plaintiffs contend that GT knew that its audit opinions were "of the utmost importance" to their decision to invest in Refco (Compl. ¶ 37), and that GT's provision of its 2003 and 2004 audits to plaintiffs therefore sufficed to create a relationship sufficiently approaching privity to give rise to a duty of care.

As an initial matter, plaintiffs do not allege that GT performed its 2003 audit for the purpose of inducing them to invest in Refco, nor could they since that audit was completed before plaintiffs expressed any interest in pursuing the LBO transaction.  (D. Mem. 6.)

Moreover, although plaintiffs do allege that GT was aware of plaintiffs' interest in Refco at the time GT conducted its 2004 audit, in the two Access Letters dated February 16, 2004, and May 4, 2004, GT expressly stated that its 2003 and 2004 audits were performed for "the objective of . . . form[ing] an opinion as to whether the consolidated financial statements . . . , present fairly, in all material respects, the financial position" of Refco, and were "not planned or conducted in contemplation of the proposed transaction between [THL] and [Refco]." (Braun Decl. Exs. B & C.) Indeed, the Letters specifically cautioned that GT's audits, and the workpapers prepared in connection with them,

> were not intended for the benefit of [THL] and should not be taken
> to supplant other inquiries and procedures that [THL] should
> undertake for the purpose of satisfying itself about the financial
> condition of [Refco] or as to other matters pertinent to the [LBO]
> transaction.

(Id.)

Plaintiffs argue that the Access Letters do not absolve GT of liability for their negligent misrepresentation and professional malpractice claims because the Letters "fail to *expressly* disavow negligence-based claims." (P. Mem. 13.) Plaintiffs' contention, however, misses the point. GT does not claim that the Access Letters functioned as waivers of negligence liability. Rather, the Letters put plaintiffs on notice that GT's 2003 and 2004 audits were not performed with the LBO transaction in mind, thus negating any understanding that GT owed a duty of care to plaintiffs in connection with those audits, and advised plaintiffs that GT "assume[d] no additional responsibility with respect to its audit[s]" by providing plaintiffs with access to their workpapers. (Braun Decl. Exs. B & C.) In the face of these assertions, and plaintiffs' acceptance of them, plaintiffs have no basis for contending that they were owed a duty by GT.

12

As evidenced by the language contained in the Access Letters, as well as the absence of any allegation that GT sought or obtained any information from plaintiffs or KPMG about the contemplated LBO transaction, GT performed its 2003 audit exclusively for the benefit of Refco, and undertook its 2004 audit "primarily for the benefit of" Refco and only "incidentally or collaterally" for plaintiffs' use in connection with the proposed LBO transaction.  Ultramares Corp. v. Touche, 255 N.Y. 170, 183 (1931); see Security Pac. Bus. Credit, Inc. v. Peat Marwick Main & Co., 79 N.Y.2d 695, 708 (1992).  Accordingly, because GT's 2003 and 2004 audits were "performed pursuant to professional standards applicable in the context of any audit, and was not undertaken pursuant to any duty owed toward [plaintiffs]," GT's provision of those audits to plaintiffs cannot constitute the requisite "linking conduct" necessary to establish the existence of a relationship sufficiently approaching privity.  Houbigant, Inc. v. Deloitte & Touche LLP, 753 N.Y.S.2d 493, 495 (1st Dep't 2003).

      B.     Meetings Between GT and KPMG

Plaintiffs contend that the two meetings on February 19 and May 7, 2004, at which GT personnel met with KMPG (on behalf of plaintiffs) to discuss the 2003 and 2004 audits, suffice to establish the existence of a near-privity relationship with plaintiffs.  Once again, however, the express terms of the Access Letters defeat plaintiffs' argument.

Although the Access Letters authorized GT and KPMG "to discuss with each other any questions raised during the course of the review" of GT's 2003 and 2004 audit work, the Letters also provided that by engaging in such discussions, "it is expressly understood that [GT] thereby assumes no additional responsibility with respect to its audit of [Refco's] consolidated financial statements."  (Braun Decl. Exs. B & C.)  The Letters also made clear that by providing KPMG

with access to its audit work, GT did "not assume any duties or obligations" and plaintiffs did "not acquire any rights as a result of such access."  (Id.)  As detailed in the complaint, all of the information provided by GT during its two meetings with KPMG — "concerning what the 2003 and 2004 audits did or did not reveal, whether they led to outstanding disagreements with management, the extent to which the audits focused on credit risk and receivables from customers, and the existence of reserves for material potential losses" — related to GT's 2003 and 2004 audit work, and thus fell within the scope of the Access Letters.  (D. Mem. 17, citing Compl. ¶¶ 72-74.)

While "face-to-face conversation . . . or other substantive communication between the parties" can often constitute the requisite "linking conduct" giving rise to a duty of care, BDO Seidman, 222 F.3d at 75 (internal quotation marks omitted), in this case GT, through the Access Letters, expressly disclaimed the assumption of any additional responsibility or duty in connection with the "discuss[ions]" of its audit work with KPMG.  (Braun Decl. Exs. B & C.)  As GT correctly contends, plaintiffs cannot establish a relationship of near-privity based on the information GT provided during the two meetings with KPMG because "such a nexus is belied by the very agreement under which [plaintiffs] received the information in the first place."  (D. Mem. 18.)  The very point of the meetings and conversations was to permit KPMG, as plaintiffs' accountants, to review GT's work; they were not for the purpose of GT to provide any accounting services to plaintiffs.  Accordingly, as with GT's provision of its 2003 and 2004

audits to plaintiffs, GT's meetings with KPMG are insufficient to establish "the practical

equivalent of privity." Credit Alliance, 65 N.Y.2d at 554.[5]

      C.     GT's Reaudit of Refco's 2002 Financial Statements

Plaintiffs additionally contend that GT's issuance of reaudited financial statements for

Refco's 2002 fiscal year created the requisite near-privity relationship. Plaintiffs apparently

suggest that, because delivery of the reaudited statements to them was made an express condition

of closing, GT "was well aware that a primary, if not the exclusive, end and aim of auditing its

client, [Refco], was to provide [plaintiffs] with the financial information it required" to engage in

the LBO transaction. Credit Alliance Corp., 65 N.Y.2d at 554. Plaintiffs urge that under such

circumstances, "the relationship thus created between the parties was the practical equivalent of

privity." Id. GT, however, asserts that regardless of whether its issuance of the reaudit opinion

created a near-privity relationship, plaintiffs have not adequately alleged that they actually relied

on the reaudit because their claims are premised on the theory that GT "induced the TH Lee

Funds to invest more than $450 million in Refco . . . in August 2004," but GT did not actually

issue its reaudit opinion until October 8, 2004. (Id. ¶¶ 1, 79.)

Section 5.10 of the LBO Purchase Agreement provided:

---

[5] Plaintiffs also allege that GT reiterated "many, if not all" of the representations it made during the two meetings with KPMG "during telephone conferences or in regular e-mail correspondence with the THL Funds and their advisors, including KPMG, between February 2004 and the [LBO] closing." (Compl. ¶ 75.) The complaint, however, fails to specify the precise content of these alleged communications, let alone who, where, and when they were made. See Mills v. Molecular Polar Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) (noting that Fed. R. Civ. P. 9(b) requires plaintiffs to "identify the speaker" of the alleged misrepresentation and "state where and when the statements were made"); Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 583 (2d Cir. 2005).

> Section 5.10 <u>2002 Financials</u>. The Company will use reasonable
> efforts to attempt to obtain and deliver to the Buyer prior to the
> Closing (but in any event, no later than sixty (60) days following
> the Closing) audited financial statements meeting the requirements
> of Regulation S-X promulgated by the SEC for financial
> statements included in filings of registration statements under the
> Securities Act of 1933, as amended, with respect to the Company's
> fiscal year ended February 28, 2002, which audited financial
> statements will be consistent with the financial statements covering
> such periods that previously have been delivered to the Buyer,
> except as such financial statements may be restated to reflect
> depreciation of intangible assets as required pursuant to Financial
> Accounting Standard 141.

(Compl. ¶ 78.) The requirement that GT's fiscal year 2002 reaudit "be consistent with the

financial statements covering such periods that previously have been delivered to the Buyer"

presumably meant that the closing was conditioned on GT issuing a clean and unqualified

reaudit opinion "consistent with" AA's original fiscal year 2002 audit. (See <u>id</u>. ¶ 27.) It is not

clear from the complaint, however, what remedy, if any, plaintiffs would have had if this

condition had not been satisfied. In particular, the complaint does not allege that plaintiffs

would have been entitled to rescind the LBO transaction if GT's reaudit opinion had disclosed

the round-trip loans that GT allegedly discovered in the course of its reaudit (<u>see id</u>. ¶ 58), or if

GT had failed to issue a reaudit opinion entirely.

As a result, although the complaint describes Section 5.10 as an "express closing

condition" (<u>id</u>. ¶ 78), in the absence of any specific allegation that plaintiffs could rescind the

LBO transaction post-closing if Section 5.10 was not satisfied, plaintiffs have failed to establish

that GT's reaudit "induced" them to invest in Refco because that decision had already been

finalized for almost two months by the time GT issued its reaudit opinion in early October 2004

(<u>id</u>. ¶ 1.) Although plaintiffs may well have anticipated that GT would issue a clean and

16

unqualified reaudit opinion prior to the August 2004 closing, their failure to insist on receiving

the reaudit prior to closing — at least in the absence of any allegation of a post-closing rescission

remedy — defeats any claim by plaintiffs that they, in fact, relied on the reaudit in making their

investment decision.  Accordingly, even assuming *arguendo* that GT issued its reaudit for the

"end and aim of" providing plaintiffs with the information they needed to consummate the LBO

transaction, Credit Alliance Corp., 65 N.Y.2d at 554, and even assuming *arguendo* that GT fully

expected plaintiffs to rely on its reaudit and thereby created a relationship equivalent to privity

when it issued its reaudit opinion, plaintiffs' failure to adequately allege reliance on the reaudit

precludes them from using the representations contained therein as a basis for any of their

claims.  See Grammar v. Turits, 706 N.Y.S.2d 453, 455 (2d Dep't 2000) (justifiable reliance

required for negligent misrepresentation claim); Busino v. Meachem, 704 N.Y.S.2d 690, 693-94

(3d Dep't 2000) (same for professional malpractice claim); Ambassador Factors v. Kandel &

Co., 626 N.Y.S.2d 803, 805 (1st Dep't 1995) (same for fraud claims).[6]

     In sum, because plaintiffs have failed to establish the existence of a relationship with GT

sufficiently approaching privity, GT did not owe plaintiffs a duty of reasonable care, and "New

York law bars recovery on any negligence theory."  Equitable Life Assur. Soc. of U.S. v.

Alexander Grant & Co., 627 F. Supp. 1023, 1033 (S.D.N.Y. 1985).  Plaintiffs' claims of

negligent misrepresentation and professional malpractice therefore must be dismissed.[7]

---

[6] Plaintiffs also allege that GT "updat[ed]" plaintiffs "regularly" on the progress of the reaudit between April and October 2004 (Compl. ¶ 79), but again, the complaint fails to specify the content of any alleged misrepresentations during these "updates," let alone who made them or where and when they were made.  See supra note 5.

[7] Despite their failure to establish the existence of a near-privity relationship with GT, plaintiffs contend that their misrepresentation and malpractice claims survive because those

### III.    Aiding and Abetting Fraud Claim

To establish liability under New York law for aiding and abetting fraud, plaintiffs must prove: "(1) the existence of a fraud; (2) a defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." JPMorgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (internal quotation marks omitted). On this motion, GT does not challenge the adequacy of the allegations as to the first and third elements, but disputes the sufficiency of the allegations as to the second. Specifically, GT asserts that plaintiffs' claim for aiding and abetting fraud must be dismissed because the complaint does not allege that GT actually knew about the fraud at Refco that it purportedly aided.

The knowledge requirement of an aiding and abetting fraud claim is satisfied by alleging actual knowledge of the underlying fraud. See Kolbeck v. LIT America, Inc., 939 F. Supp. 240,

---

claims "sound in intentional misconduct and gross negligence," and "privity or its equivalent is not required for claims . . . premised on intentional or grossly negligent conduct." (P. Mem. 21 (emphasis omitted).) Although plaintiffs are correct that privity or its equivalent is not required for claims based on intentional fraud, see Ultramares, 225 N.Y. at 179-83, their failure to allege a relationship sufficiently approaching privity "prevents recovery under *any* negligence theory," including gross negligence. N.Y. Jur. 2d Malpractice § 10 (2008) (emphasis added); Equitable Life Assur., 627 F. Supp. at 1033; Credit Alliance Corp., 65 N.Y.2d at 554. Plaintiffs' citation to Caprer v. Nussbaum, 825 N.Y.S.2d 55 (2d Dep't 2006) (P. Mem. 21), does not alter this conclusion because the reference to gross negligence in that case appears, not in the context of an independent claim based on gross negligence, but rather, in the context of a fraud claim "in which a showing of gross negligence or recklessness will permit the trier of fact to draw the inference that a fraud was in fact perpetrated," Rotterdam Ventures, Inc. v. Ernst & Young LLP, 752 N.Y.S.2d 746. 747 (3d Dep't 2002); see N.Y. Jur. 2d Malpractice § 10 (noting that "New York law does not recognize an independent cause of action for gross negligence against accountants which does not rise to the level of fraud"). Accordingly, although plaintiffs' failure to establish privity or its practical equivalent does not preclude their claim for intentional misrepresentation, it necessarily dooms their claims for both negligent misrepresentation and professional malpractice, "which is a species of negligence." Hydro Investors, 227 F.3d at 15; Cromer, 137 F. Supp. 2d at 495.

18

246 (S.D.N.Y. 1996) ("New York courts and federal courts in this district[] have required actual knowledge."); see also VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004) (noting that "[a]llegations that a defendant should have known of fraud are insufficient"); Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2284, 2003 WL 21436164, at *9 (S.D.N.Y. June 23, 2003) (observing that "a showing of recklessness will not suffice" for aiding and abetting claims).  To survive dismissal, the complaint must allege facts giving rise to a "strong inference" of defendant's actual knowledge of the fraud.  Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007); see VTech, 348 F. Supp. at 269, Mazzaro de Abreu v. Bank of America Corp., 525 F. Supp. 2d 381, 388 (S.D.N.Y. 2007).

Preliminarily, this Court previously denied GT's motion to dismiss the related securities class action for failure to allege scienter, based on similar allegations.  See In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007).[8]  In this case, the complaint specifically alleges that "Grant Thornton *knew of*, or wilfully ignored, the *fraudulent conduct*, in whole or in part, described herein."[9]  (Compl. ¶ 90 (emphasis added).)  To support plaintiffs' claim of actual

---

[8] Although the pleading standard for scienter in the securities class action is recklessness rather than actual knowledge, the Court noted in connection with GT's motion to dismiss in that case that "[f]or an accountant to be found to have acted recklessly during an audit, its alleged misconduct must 'approximate an actual intent to aid in the fraud being perpetrated by the audited company.'"  In re Refco, 503 F. Supp. 2d at 657, quoting Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir. 2000).

[9] In pleading in the alternative that GT "wilfully ignored" the fraud at Refco (Compl. ¶ 90), plaintiffs urge the Court to adopt a "conscious avoidance" pleading standard.  (P. Mem. 20.)  See Fraternity Fund, 479 F. Supp. 2d at 368; Cromer, 2003 WL 21436164, at *9 (noting that "there is no reason to believe that New York law would not accept willful blindness as a substitute for actual knowledge in connection with aiding and abetting claims").  The Court need not decide whether an allegation of conscious avoidance is sufficient to allege scienter for a claim of aiding and abetting fraud because, as explained below, plaintiffs have adequately alleged facts giving rise to a strong inference of GT's actual knowledge.

knowledge, the complaint sets forth numerous red flags that purportedly alerted GT to the Refco

fraud.  Specifically, the complaint alleges that GT "was aware that (i) Refco participated in

related-party transactions with RGHI . . . ; (ii) Refco was owed a very large receivable from

RGHI; (iii) the receivable had existed for a lengthy period of time; and (iv) the receivable was

unsecured."  (Id. ¶ 59.)  The complaint also alleges that in connection with its audits of Refco,

GT discovered numerous "suspicious" and "recurring" period-end round-trip loan transactions

"designed to hide the RGHI Receivable," including several "reverse repo" transactions with third

parties involving hundreds of millions of dollars that were not secured by collateral.  (Id. ¶¶ 54-

59.)

GT contends that its awareness of certain specific "reverse repo" transactions is

insufficient to show actual knowledge of the Refco fraud because "there is nothing fraudulent

about these transactions in and of themselves."  (P. Mem. 12.)  In particular, GT claims that it

was never provided with documentation sufficient to discover the fraud because Refco's books at

the close of each reporting period showed only a loan to a third-party and did not disclose that

the transactions were being routed back to Refco-related entities.  This contention, however, is

belied by the complaint's allegation that during an interim review of Refco's November 2004

financial statements, GT discovered a $545 million "reverse repo" transaction between Refco

and a third party that coincided precisely with an RGHI "reverse repo" transaction "on the same

day in the same amount."  (Id. ¶ 57.)  The only difference between the two transactions was the

interest rate — the third party was charged 2.00%, while RGHI was charged 2.75%.  (Id.)

Particularly in the context of long-held suspicions by GT's engagement partner (Ramler) that

"related-party transactions between [Refco and RGHI] created a high risk of material

20

misstatement" (id. ¶ 50), GT's discovery of these identical "reverse repo" transactions was surely a significant red flag strongly suggesting a link between Refco's transactions with the third party and RGHI.[10]

Reading the complaint as a whole, plaintiffs allege that GT knew, *inter alia*, of (1) the existence of a significant unsecured receivable owed to Refco by RGHI, (2) the repeated appearance and disappearance of large receivables through unsecured transactions with third parties straddling the end of Refco's financial reporting periods, and (3) at least one instance in which a "reverse repo" transaction between Refco and a third party coincided exactly with an identical RGHI "reverse repo" transaction on the same day in the same amount. These allegations, coupled with Ramler's longstanding concerns regarding the "high risk of material misstatement" posed by related-party transactions between Refco and RGHI (id.), are together more than sufficient to support a strong inference of GT's actual knowledge of the underlying fraud. Accordingly, GT's contention that plaintiffs have failed to adequately allege scienter is without merit, and its motion to dismiss the aiding and abetting fraud claim must be denied.[11]

---

[10] GT additionally notes that recent indictments against individuals purportedly involved with the Refco fraud "allege that the scheme was designed to hide Refco's true condition from its *auditors*." (D. Reply Mem. 11.) These indictments, however, represent the government's theory of criminal liability, and GT advances no persuasive reason why the civil plaintiffs in this case should be bound by the government's criminal theory.

[11] The complaint also cites an undated, handwritten note by Ramler that refers to a $450 million round-trip loan to a third party in May 2005. (Compl. ¶ 54.) Underneath the reference to that loan, Ramler wrote "clean up of interco accounts," which plaintiffs contend is a description of the transaction's purpose — i.e., "to facilitate the 'clean up' of related-party obligations through a third-party transaction (precisely how the fraud was conducted.)" (P. Mem. 19.) As GT points out, however, the May 2005 round-trip loan occurred nine months after the LBO transaction closed in August 2004. As a result, the handwritten note does not directly evidence what Grant Thornton knew at the time relevant to the claims in this case. Plaintiffs, however, "submit that this note does not reflect new-found knowledge, but rather confirms [GT's] ability

## IV.    Justifiable Reliance

GT asserts that all of plaintiffs' claims must be dismissed in their entirety because plaintiffs cannot establish that they justifiably relied on GT's representations regarding Refco's financial condition.  As noted above, justifiable reliance is a required element for all of plaintiffs' claims.  See supra at 17.

In assessing whether reliance on allegedly negligent or fraudulent misrepresentations is justifiable, New York law takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision. "Ordinarily there is no duty to exercise due diligence, and [courts] have described the necessary showing of care as 'minimal diligence' or 'negating its own recklessness.'" Banque Franco-Hellenique de Commerce Int'l et Mar., S.A. v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997), quoting Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1015-16 (2d Cir. 1989).  However, sophisticated business entities are held to a higher standard.  In particular, "where the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." JPMorgan Chase v. Winnick, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) (internal quotation marks omitted).  Therefore, "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access,

---

to understand the nature of the virtually identical round-trip loan transactions in prior years."  (P. Mem. 19.)  The Court need not decide to what extent, if any, Ramler's handwritten note is probative of GT's scienter during the relevant time period because, irrespective of that note, plaintiffs have alleged sufficient facts giving rise to an inference of GT's actual knowledge of the fraud.

New York courts are particularly disinclined to entertain claims of justifiable reliance."

Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) (internal quotation

marks omitted).

Preliminarily, GT argues that plaintiffs could not have justifiably relied on its

representations during the diligence process because the Access Letters expressly stated that

GT's audit work was not intended for the benefit of plaintiffs. Specifically, the Access Letters

provided that GT's audits, and the workpapers prepared in connection with them,

> [were] not planned or conducted in contemplation of the proposed
> [LBO] transaction between [THL] and [Refco] . . . , were not
> intended for the benefit of [THL] and should not be taken to
> supplant other inquiries and procedures that [THL] should
> undertake for the purpose of satisfying itself about the financial
> condition of [Refco] or as to other matters pertinent to the
> transaction . . . .

(Braun Decl. Exs. B & C.) As explained above, the Access Letters operated to disclaim any

understanding that GT owed a duty of reasonable care to plaintiffs. Nothing in the Access

Letters, however, purports to disclaim any and all *reliance* on GT's representations in connection

with the due diligence process. The language in the Letters cautioning plaintiffs that GT's audit

work was "not intended for the[ir] benefit" and "should not be taken to supplant" their own

inquiries is not a disclaimer of reliance, much less an express disclaimer necessary to render

plaintiffs' reliance unreasonable as a matter of law.[12] (Id.) The import of the cautionary

language is merely to put plaintiffs on notice that GT's audits and workpapers were not

---

[12] See Harsco Corp. v. Segui, 91 F.3d 337, 345 (2d Cir. 1996) ("[W]here a party
*specifically* disclaims reliance upon a particular representation in a contract, that party cannot . . .
claim it was fraudulently induced to enter into the contract by the very representation it has
disclaimed reliance upon." (emphasis added)).

performed with the LBO transaction in mind and that, "[t]herefore, items of possible interest to

TH Lee Partners may not have been specifically addressed." (Id.)  Although the Access Letters

may certainly be relevant to the fact-finder in assessing whether any reliance that plaintiffs

placed on GT's audit work was reasonable, nothing in the Access Letters requires a finding that

plaintiffs' reliance on GT's representations was unreasonable as a matter of law, particularly

since the Access Letters themselves expressly contemplate such reliance.  (See id. (noting that

"the information acquired as a result of this review of [GT's] work papers will be *used* by [THL]

and those acting on its behalf only *in connection with its evaluation of the transaction*"

(emphasis added)).)

Irrespective of the Access Letters, GT also argues that plaintiffs could not have

justifiably relied on its representations because plaintiffs themselves are sophisticated investors

who retained their own advisors, including their own accounting firm, to research and verify

Refco's financial condition.  Plaintiffs, however, contend that their reliance on GT's

representations was justified because GT "possessed unique and specialized knowledge and

expertise" regarding Refco's finances.  (Compl. ¶ 94.)  Specifically, plaintiffs allege that at the

time due diligence commenced for the LBO transaction, the head of GT's audit team, Ramler,

had served as the engagement partner on the Refco account for over a decade.  (Id. ¶ 29.)  Based

on his lengthy tenure overseeing the Refco audits, Ramler allegedly was "knowledgeable

regarding Refco's business and the relationships between its various entities" and

"acknowledged that Bennett and other members of Refco's senior management called him on an

almost daily basis to discuss transactions and business issues."  (Id. ¶ 30.)

As noted above, moreover, plaintiffs contend that Ramler knew that Refco was owed a large, unsecured receivable from RGHI and was concerned that "related-party transactions between [Refco and RGHI] created a high risk of material misstatement," but did not disclose this information to plaintiffs.  (Id. ¶ 50.)  Plaintiffs also allege that in the course of its Refco audits, GT discovered the recurring "round-trip loans designed to hide the RGHI Receivable," but "did not require their disclosure in Refco's audited financial statements, and never informed the THL Funds or their advisors that such questionable transactions were occurring with alarming frequency and regularity."  (Id. ¶ 59.)  According to plaintiffs, this damaging information regarding Refco's financial condition was "peculiarly within [GT's] knowledge" and "plaintiffs had no independent means of ascertaining the truth."  (P. Mem. 29 (internal quotation marks omitted).)

As the Second Circuit has observed, "[t]he question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive."  Schlaifer Nance, 119 F.3d at 98; see Winnick, 350 F. Supp. 2d at 407.  Although GT is correct that plaintiffs are sophisticated investors, it is far from clear on this sparse, pre-discovery record whether plaintiffs had access to the "critical information" necessary to discover the Refco fraud on their own.  Schlaifer Nance, 119 F.3d at 98.  For example, although it is undisputed that plaintiffs had access to "certain workpapers" prepared by GT in connection with its audit opinions (Braun Decl. Exs. B & C), it is not clear whether those workpapers contained all of the information necessary to discover the existence of the RGHI receivable or the round-trip loan transactions, or whether the workpapers themselves complied with the governing auditing standards requiring "documentation sufficient to show that the audit evidence obtained, the auditing procedures applied, and the testing

performed have provided sufficient competent evidential matter to afford a reasonable basis for an opinion." (Compl. ¶ 44.) It is also unclear to what extent, if at all, plaintiffs had access to Refco's underlying accounting data, or whether such access was needed to uncover the existence of the fraudulent scheme. Even if plaintiffs did have access to all of the relevant documents, moreover, it is unclear whether the fraudulent scheme could have been discovered "by the exercise of ordinary intelligence," or "only with extraordinary effort or great difficulty." Winnick, 350 F. Supp. 2d at 406, 410 (internal quotation marks omitted).

At this threshold stage of the litigation, however, a complaint needs only to plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974. Indeed, as explained above, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer, 416 U.S. at 236. Given the complaint's allegations regarding Ramler's longstanding relationship with Refco, as well as the limited extent (if at all) to which plaintiffs and their advisors had access to GT's workpapers and Refco's underlying accounting data, plaintiffs have alleged more than enough facts to raise their claim of justifiable reliance on GT's representations "above the speculative level." Twombly, 127 S. Ct. at 1965. Accordingly, because nothing in the Access Letters precluded plaintiffs as a matter of law from relying on GT's representations, and because plaintiffs have amplified their claim of justifiable reliance with sufficient factual allegations "to render the claim plausible," Iqbal, 490 F.3d at 158 (emphasis omitted), GT's motion to dismiss the complaint for failure to plead justifiable reliance must be denied.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss is granted with respect to plaintiffs' negligent misrepresentation and professional malpractice claims, and denied as to all other claims.

SO ORDERED:

Dated: New York, New York
     August 6, 2008

GERARD E. LYNCH
United States District Judge

27